937 F.2d 1388
 21 Envtl. L. Rep. 21,117
 UNITED STATES of America, Plaintiff-Appellee,
v.
Patrick LEE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jen-Tai CHU, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Wesley Ming HSU, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Meng Gin HSU, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Chan Lon LIN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
John Chin-Hong WANG, Defendant-Appellant.
 Nos. 90-30127, 90-30150, 90-30162, 90-30164, 90-30165 and 90-30175.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 8, 1991.
Decided June 28, 1991.
 
 Mark D. Mestel, Mestel & Muenster, Everett, Wash., Fred Boness, Preston Thorgrimson Shidler Gates & Ellis, Anchorage, Alaska, Larry Finegold, Finegold & Zulauf, James L. Vonasch, Peter A. Camiel, Mair, Abercrombie, Camiel & Rummonds, David S. Marshall, Prince, Kelley, Newsham & Marshall, Seattle, Wash., for defendants-appellants.
 John T. Stahr, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.
 Appeal from the United States District Court for the Western District of Washington.
 Before WALLACE, Chief Judge, and O'SCANNLAIN and LEAVY, Circuit Judges.
 WALLACE, Chief Judge:
 
 
 1
 Lee, Chu, Wesley Hsu, Meng Hsu, Lin, and Wang (the fishermen) were indicted on various charges related to the illegal acquisition, sale and importation of salmon caught in Northern Pacific waters. Each of the fishermen filed pretrial motions to dismiss the charges on the grounds that the Lacey Act (Act), 16 U.S.C. Secs. 3371-78, was inapplicable and unconstitutional. The district court denied these motions, and the fishermen then pleaded guilty. Pursuant to Federal Rule of Criminal Procedure 11(a)(2), the fishermen reserved the right to appeal the district court's adverse rulings on their pretrial motions, and on that basis they now appeal from the judgment of the district court. The district court had jurisdiction pursuant to 16 U.S.C. Sec. 3375(c) and 18 U.S.C. Sec. 3231. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. Sec. 1291. We affirm.
 
 
 2
 * After receiving information that Lee was advertising salmon caught by vessels from the Republic of China (also referred to as Taiwan) for sale in the United States, the National Marine Fisheries Service (Service) of the Department of Commerce initiated an undercover investigative operation in early 1989. In connection with this operation, an undercover Service agent negotiated with Lee to purchase 500 metric tons of salmon that had been taken illegally by Taiwanese squid fishing vessels in the Northern Pacific waters. Lee agreed to transfer the salmon on the high seas from Taiwanese vessels to an American carrier, the Redfin, which was chartered by the Service for this operation. The salmon were then to be smuggled into the United States at Seattle, Washington, with their true origin masked through the use of fraudulent United States Certificates of Origin. In return for the salmon, the agent agreed to pay Lee $1.3 million in a series of transactions, including payments of cash, cashier's checks and monetary wire transfers. Each of the remaining five defendants were involved along with Lee in this operation, providing various services related to either the salmon transfer or the payment of funds.
 
 
 3
 On July 18, 1989, Taiwanese fishing vessels rendezvoused with the Redfin in international waters. Meng Hsu, Lin, and Chu went aboard the Redfin to await word of payment before transferring the salmon, and were arrested by government officials there. Meanwhile, Lee and Wesley Hsu accompanied the Service agent to a Seattle bank, where they received $330,000 for the first 129 metric tons of salmon. Both men were arrested before leaving the bank. Wang was arrested on the same date in his Seattle hotel room.
 
 
 4
 The government charged the fishermen with various crimes in a seven-count indictment. Principal among these allegations was the charge that the fishermen had violated the Act by engaging in a conspiracy to import salmon into the United States, while knowing that it had been taken in violation of the laws of Taiwan. Although the fishermen pleaded guilty, they reserved the right to challenge on appeal the applicability and constitutionality of the Act.
 
 II
 
 5
 The section of the Act under which the fishermen were charged makes it unlawful for any person "to import, export, transport, sell, receive, acquire, or purchase ... any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State or in violation of any foreign law." 16 U.S.C. Sec. 3372(a)(2) (emphasis added). A portion of the indictment charged that the fishermen imported salmon into the United States, while knowing that the salmon had been taken in violation of a Taiwanese regulation that prohibits Taiwanese squid fishing vessels from catching salmon. The fisherman contend that their unlawful taking of salmon cannot result in an Act violation, because the Taiwanese regulation at issue does not constitute a "foreign law" under section 3372(a)(2)(A). The district court rejected this argument. We review de novo the district court's interpretation of the Act. United States v. Thomas, 887 F.2d 1341, 1343 (9th Cir.1989).
 
 
 6
 The fishermen argue that the term "any foreign law" encompasses only foreign statutes, not foreign regulations. They point out that, prior to its amendment in 1981, the Act prohibited trade in wildlife taken in violation of "any law or regulation of any State or foreign country," 18 U.S.C. Sec. 43(a)(2) (1976) (repealed on Nov. 16, 1981, by Pub.L. No. 97-79, Sec. 9(b)(2), 95 Stat. 1079), but now does not mention "regulation," see 16 U.S.C. Sec. 3372(a)(2). Moreover, they focus on the fact that the present section 3372(a)(2)(A) makes reference to "any law or regulation" in the context of state law, but does not mention "regulation" when referring to foreign law. In effect, they argue that because the Act no longer makes reference to foreign "regulations," the term "any foreign law" cannot include such regulations.
 
 
 7
 When presented with similar arguments in United States v. 594,464 Pounds of Salmon, 871 F.2d 824 (9th Cir.1989) (594,464 Pounds ), however, we ruled that a Taiwanese regulation prohibiting the export of salmon without a permit constituted a "foreign law" under section 3372(a)(2)(A) and thereby supported an Act violation. That regulation was issued, as in this case, by a body of the Executive Yuan of the Republic of China, and we concluded that "the Act's term 'any foreign law' necessarily encompasses the Taiwanese regulation." Id. at 828. We first focused on the generally broad definition of the word "law" as " 'a body of rules of action or conduct prescribed by controlling authority, and having binding legal force.' " Id. at 826, quoting Black's Law Dictionary (5th ed. 1979). In response to the arguments regarding the significance of the failure to mention "regulation" when referring to foreign law, we observed that the 1981 Act Amendments "were passed in response to Congress's frustration at the inadequacy" of prior laws. Id. at 827; see also S.Rep. No. 123, 97th Cong., 1st Sess. 2-4, reprinted in 1981 U.S.Code Cong. & Admin.News 1748, 1749-51. Because Congress desired to expand the scope of the Act, we concluded that the term "any foreign law" was used not to limit the Act's applicability, but instead to encompass the wide range of laws passed by "the world's regimes that possess systems of law and government that defy easy definition or categorization." 594,464 Pounds, 871 F.2d at 828. A narrow interpretation that did not include at least foreign regulations as grounds for violations would only serve to "gut[ ] the statute." Id.
 
 
 8
 Thus, circuit precedent indicates that this Taiwanese regulation, almost identical to the one in 594,464 Pounds, constitutes a "foreign law." The fishermen urge a different result, however, because this action involves criminal penalties rather than the forfeiture action at issue in 594,464 Pounds. The Act provides for civil penalties, criminal penalties, and forfeiture of illegally taken fish and wildlife. See 16 U.S.C. Secs. 3373(a) (civil), 3373(d) (criminal), 3374 (forfeiture). All of these penalties are meant to apply to those who engage in conduct in violation of section 3372. See id. No reason exists to suppose that Congress intended "any foreign law" to mean something different in the criminal context than in the forfeiture context. Thus, the interpretation set forth in 594,464 Pounds is applicable in this case.
 
 
 9
 The fishermen contend that the term "foreign law" is ambiguous, citing as support our statement in 594,464 Pounds. See 871 F.2d at 828 ("the statutory language 'any foreign law' cannot be said to be unambiguous when read in the context of the entire subsection"). Because "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity," Rewis v. United States, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971), they argue that we should diverge from the 594,464 Pounds interpretation and construe "foreign law" more narrowly in the criminal context. We conclude, however, that the Act's criminal sanctions provision resolves any possible ambiguity. That provision only allows for the imposition of criminal penalties if a violator knew or, in the exercise of due care, should have known that he was taking fish unlawfully under "any underlying law, treaty, or regulation." 16 U.S.C. Sec. 3373(d)(1)-(2). Because the criminal culpability requirements make reference to regulations, and because it seems clear that Congress intended "foreign law" to have a singular meaning throughout the Act, we hold that the Taiwanese regulation constitutes a "foreign law" in this case.
 
 
 10
 The fishermen also argue that even if some foreign regulations are sufficient bases for Act violations, this regulation is not one of them. Relying on a Third Circuit case, they assert that in order to qualify as a "foreign law" under the Act, a regulation must have been "designed and intended for the protection of wildlife." United States v. Molt, 599 F.2d 1217, 1218-19 (3d Cir.1979) (Molt ). They allege that the Taiwanese salmon regulation was not intended to protect salmon but was instead an economic measure, and is therefore inapplicable under the Act. In amending the Act in 1981, however, Congress clearly expressed its intent that the interpretation in Molt was "too restrictive." S.Rep. No. 123, 97th Cong., 1st Sess. 6, reprinted in 1981 U.S.Code Cong. & Admin.News 1748, 1753. Because the regulation "clearly does relate to wildlife," it is an applicable regulation under the Act. Id.
 
 III
 
 11
 The fishermen next contend that Congress did not intend to impose criminal penalties under the Act for violations of a regulation that itself carries no criminal sanctions. They observe that the regulation at issue here provides only for the suspension of the licenses of the offending fishing vessel and the offending captain; it imposes no criminal penalties. Thus, the fisherman argue, to base criminal penalties on violations of this regulation is an unjustifiable, absurd result. See United States v. Turkette, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981).
 
 
 12
 In 594,464 Pounds, we rejected the argument that the Act did not encompass a Taiwanese salmon regulation because that regulation only provided for the imposition of civil sanctions. We concluded that the legislative history clearly demonstrated that "Congress intended the 1981 Amendments to apply to 'laws' that have nothing more than civil fines for penalties." 871 F.2d at 829. Because that holding was in the context of a forfeiture proceeding, however, the fisherman argue that it does not control in the present case.
 
 
 13
 The fishermen's interpretation is contrary to both the language and legislative history of the Act, and has been rejected by this court. In imposing criminal punishment for wildlife takings in violation of any underlying foreign law, the Act draws no distinction based on the type of sanction imposed by the underlying law. See 16 U.S.C. Sec. 3373(d); see also id. Sec. 3371(d) (defining "law" broadly for purposes of the Act, as any law "which regulate[s] the taking, possession, importation, exportation, transportation, or sale of fish or wildlife or plants"). If foreign regulations do indeed qualify as "foreign laws" and can thereby support Act violations, no reason exists to suppose that Congress intended civil penalties to be imposed for violations of either criminal or civil regulations, while intending that criminal penalties only result from criminal regulation violations.
 
 
 14
 The fishermen argue the "inherent unfairness of applying criminal penalties to conduct that does not carry a criminal sanction in the relevant foreign country." They rely on United States v. Gordon, 464 F.2d 357 (9th Cir.1972), in which a federal gambling statute criminalized violations of "the law of a State." When confronted with uncertainty over whether Congress intended to refer only to state criminal laws or to refer also to civil laws, we resolved the ambiguity in favor of the defendant, holding that the federal crime could not be based on state civil violations. See id. at 357-58.
 
 
 15
 More on point, however, is United States v. Cameron, 888 F.2d 1279 (9th Cir.1989), in which we upheld a criminal Act charge that was based on the taking of halibut in violation of the federal Halibut Act, even though the Halibut Act only provided for civil penalties. Id. at 1282. We observed that criminal sanctions under the Act require an element of scienter. Id. This was inserted by Congress in response to fears that a simple general intent statute "would contain too much potential for abuse." S.Rep. No. 123, 97th Cong., 1st Sess. 12, reprinted in 1981 U.S.Code Cong. & Admin.News 1748, 1759. This indicates that Congress foresaw the consequences of imposing criminal sanctions under the Act on those who would only suffer civil penalties for violations of the underlying law, and decided to mitigate these consequences by including the higher criminal culpability requirement. We conclude that the statutory language, the legislative history, and our holding in Cameron all support the position that criminal penalties under the Act can be predicated on foreign regulations imposing only civil sanctions.
 
 IV
 
 16
 Of the six fishermen, only Meng Hsu was the captain of a squid fishing vessel, so only he could be penalized in the Republic of China under the salmon regulation at issue. Because they were not subject to any sanction in the Republic of China, the other five fishermen contend that the regulation cannot support Act criminal sanctions against them. This argument, however, mistakes what action the Act penalizes. As demonstrated above, it is irrelevant under the Act whether the fishermen would be exposed only to civil sanctions under the regulation. Similarly, it is irrelevant whether the fishermen would be liable at all under the regulation. The Act's criminal penalty provision does not require that the fishermen violated the regulation, but only that they took part in importing the salmon when they knew, or should have known, that the salmon had been taken in violation of the regulation. 16 U.S.C. Sec. 3373(d)(1)-(2). Thus, all six fishermen, whether or not they occupied the position of captain on the ship, are equally subject to the Act's criminal penalties.
 
 V
 
 17
 The fishermen next contend that, by making it unlawful under 16 U.S.C. Sec. 3372(a)(2) to trade in fish and wildlife "in violation of any foreign law," the Act unconstitutionally delegates congressional power to foreign governments. They argue that because foreign governments are free to define an essential element of an Act violation by passing any type of "foreign law," the Act violates article I of the Constitution, which vests all legislative powers in Congress. We review de novo the district court's rulings regarding questions of federal constitutional law. United States v. Savinovich, 845 F.2d 834, 839 (9th Cir.), cert. denied, 488 U.S. 943, 109 S.Ct. 369, 102 L.Ed.2d 358 (1988).
 
 
 18
 The answer to this argument is found in 594,464 Pounds. Following the decisions of four other circuits, we held that the Act does not impermissibly delegate any legislative power to foreign governments. We reasoned that "the Act does not call for the assimilation of foreign law into federal law." 871 F.2d at 830. Although the Act does depend upon violations of foreign law, we held that "the [United States] government is not applying the foreign law per se, but rather it is looking to the foreign law to determine if the Act's provisions are triggered; if so, then it will apply the Act, and not the foreign law." Id. Read in this manner, the Act delegates no power to foreign governments, and therefore does not violate article I. Accord United States v. Rioseco, 845 F.2d 299, 302 (11th Cir.1988); United States v. Bryant, 716 F.2d 1091, 1094-95 (6th Cir.1983) (Bryant ), cert. denied, 465 U.S. 1009, 104 S.Ct. 1006, 79 L.Ed.2d 238 (1984); Molt, 599 F.2d at 1219 n. 1; Rupert v. United States, 181 F. 87, 90-91 (8th Cir.1910).
 
 
 19
 The fishermen contend that we should not follow this precedent because of Mistretta v. United States, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). They argue that Mistretta requires clear and specific guidelines in order for a delegation of power to be permissible under article I. Because the Act provides no such guidelines in delegating authority to foreign governments, they contend that Mistretta requires us to reverse our holding that the Act is constitutional. Mistretta, however, does not control. Its discussion pertains only to what is permissible when there is a delegation of legislative power by Congress. See id. at 371, 109 S.Ct. at 654. We have held, along with four other circuits, that the Act results in no delegation of legislative power, so the Mistretta discussion is therefore inapplicable. 594,464 Pounds, 871 F.2d at 830.
 
 
 20
 Finally, the fishermen point out that the Act does not provide for the translation into English of all foreign laws that may be the predicate for a violation. Because there is no feasible way to read these regulatory foreign laws in English, the fishermen argue that Congress has not retained the power to revise, alter, or revoke the power the Act grants to foreign governments. Thus, they contend, the Act's reliance upon foreign law is invalid. This argument fails, however, in light of the fact that Congress can obtain translations of any law that it wishes to review. We therefore reject the argument that the Act unconstitutionally delegates congressional power.
 
 VI
 
 21
 The fishermen next contend that the Act is unconstitutionally vague because it fails to satisfy the due process requirements of fair notice and fair enforcement.
 
 A.
 
 22
 With regard to fair notice, " 'because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.' " Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982) (Hoffman Estates), quoting Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972) (Grayned ). The fishermen argue that the Act's proscriptions do not clearly encompass the salmon regulation, and that therefore the Act fails to "give a person of ordinary intelligence adequate notice of the conduct it proscribes." 594,464 Pounds, 871 F.2d at 829.
 
 
 23
 We confronted this issue in 594,464 Pounds, and held that the term "any foreign law" was sufficiently clear to provide fair warning that the Act proscribes violations of the Republic of China regulation at issue in that case. Id. Thus, we ruled that the use of that term to define Act violations satisfied the constitutional standards of due process. Id. The fishermen argue, however, that our previous determination is applicable only to the civil forfeiture context under section 3374. Because "[a] statute providing for civil sanctions is reviewed for vagueness with somewhat greater tolerance than one involving criminal penalties," they contend that the Act is not sufficiently clear to justify the imposition of criminal penalties. 594,464 Pounds, 871 F.2d at 829, citing Hoffman Estates, 455 U.S. at 498-99, 102 S.Ct. at 1193-94 (quotation omitted). They would have us hold that although section 3372 defines violations precisely enough to justify forfeiture proceedings, it is too vague to support criminal sanctions under section 3373.
 
 
 24
 This argument fails to recognize, however, "that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." Hoffman Estates, 455 U.S. at 499, 102 S.Ct. at 1194. Significantly, in enacting the criminal penalty provisions in 1981, Congress acknowledged the potential for abuse if it criminally punished conduct that was simply a violation of foreign law. "[A]s a simple general intent statute, the Lacey Act Amendments of 1981 would contain too much potential for abuse and indiscriminate enforcement efforts." S.Rep. No. 123, 97th Cong., 1st Sess. 12, reprinted in 1981 U.S.Code Cong. & Admin.News 1748, 1759. Thus, Congress inserted a culpability requirement when defining the violations that are subject to criminal penalty. As a result, although civil forfeiture penalties may be imposed solely upon proof that a defendant has violated section 3372, as when he or she has imported fish in violation of a foreign law, criminal penalties are imposed less freely. In order to be subject to criminal sanction, one must engage in conduct violative of section 3372, and must know or, in the exercise of due care, should know that "the fish or wildlife or plants were taken, possessed, transported, or sold in violation of, or in a manner unlawful under, any underlying law, treaty or regulation." 16 U.S.C. Sec. 3373(d)(1)-(2). Thus, although one may be held strictly liable under the forfeiture provision for section 3372 violations, one must be significantly more blameworthy to be subject to the Act's criminal penalties.
 
 
 25
 This added scienter element prevents the Act from criminally punishing those who violate the Act's provisions but are reasonably unaware that they are doing so. The protections inserted by Congress prevent the Act from "trap[ping] the innocent by not providing fair warning," Grayned, 408 U.S. at 108, 92 S.Ct. at 2299, and therefore mitigate any potential vagueness of the Act. See 594,464 Pounds, 871 F.2d at 829; Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 342, 72 S.Ct. 329, 331, 96 L.Ed. 367 (1952) (the requirement of "culpable intent as a necessary element of the offense does much to destroy any force in the argument that application of the Regulation would be so unfair that it must be held invalid"). We therefore hold that the Act's language provides the "reasonable degree of certainty" that is demanded in this area to withstand an attack for failure to provide sufficient notice. Id. at 340, 72 S.Ct. at 330; see Bryant, 716 F.2d at 1095 (upholding the Act "as a whole" against a vagueness attack in the criminal context).
 
 
 26
 The fishermen also present several more narrow arguments in support of their vagueness attack. They contend that the failure of the government to provide written English translations of all foreign laws that can serve as predicates for Act violations results in a lack of fair notice. However, the Act is not "rendered unconstitutional by the fact that it, unlike many other federal laws, requires of a person a knowledge of underlying statutes." Id. Moreover, the culpable intent requirements eliminate the chance that criminal punishment will be imposed on one who violates the Act as a result of having no English translation.
 
 
 27
 Next, five of the six fishermen contend that because none of them were a captain and were therefore not subject to any penalty in the Republic of China, the Act is unconstitutionally vague when applied to them. The Act does not require that these fishermen violated the regulation, however, and therefore the fishermen's argument is inapposite. Whether or not the regulation alone could subject them to any sanction, the Act makes it clear that they are subject to the Act's criminal penalties if they import fish that was taken in violation of any foreign law, and if they knew or should have known that it was taken unlawfully. 16 U.S.C. Sec. 3373(d)(1)-(2). The Act is no more vague as applied to them than it is as applied to the captain.
 
 
 28
 The fishermen also argue that United States v. Stenberg, 803 F.2d 422 (9th Cir.1986), compels a ruling that the Act's foreign law language is too vague to support criminal penalties. In Stenberg, we held that the Act's prohibition on the sale of wildlife illegally obtained did not encompass the sale of guiding services, because "[a]t the very least, one would have to speculate whether such conduct falls within the prohibition on 'selling wildlife.' " Id. at 436. Stenberg 's interpretation of the word "sell," however, does not control our determination of the fair notice given by the Act's foreign law language. 16 U.S.C. Sec. 3372(a)(2). Moreover, the term "any foreign law" encompasses a foreign regulation much more easily than the term "sale of wildlife" encompasses the sale of guiding services.
 
 
 29
 Finally, the fishermen argue that although 594,464 Pounds held that the Act's use of "any foreign law" was not unconstitutionally vague, it did so only because the defendant was "a corporation frequently involved in large international commercial transactions." 871 F.2d at 829. The fishermen argue that the Act did not give them fair notice because they are not such a knowledgeable corporation. 594,464 Pounds did not hold, however, that the Act's language is constitutionally valid only with respect to large corporations. Furthermore, such a consideration of a defendant's expected knowledge is not necessary when analyzing the Act's criminal penalty provisions. As stated above, the Act allows criminal sanctions only upon a showing of culpability. See 16 U.S.C. Sec. 3373(a), (d); S.Rep. No. 123, 97th Cong., 1st Sess. 10-12, reprinted in 1981 U.S.Code Cong. & Admin.News 1748, 1757-59 (observing that the due care standard should be "applied differently to different categories of persons with varying degrees of knowledge and responsibility"). Thus, the Act itself protects the reasonably naive from unwarranted criminal penalties.
 
 B.
 
 30
 The fishermen briefly argue that the Act violates the constitutional requirement of fair enforcement, because it gives government officials "unlimited discretion" to prosecute those who have violated numerous foreign wildlife laws. In truth, however, the Act sets forth sufficiently "explicit standards" when defining what constitutes a crime. Grayned, 408 U.S. at 108, 92 S.Ct. at 2299. For example, government officials in this case did not exercise any sort of boundless discretion. They only had to determine objectively that the salmon being imported had been taken in violation of the Republic of China law prohibiting their taking by a squid vessel, and charge the fishermen accordingly. As in 594,464 Pounds, "government officials who seized the salmon did not have unlimited discretion to apply the Act as they saw fit," 871 F.2d at 830, and we conclude that the Act is not unconstitutional on fair enforcement grounds.
 
 VII
 
 31
 Lee and Wesley Hsu filed separate motions in the district court to dismiss those counts that were based on violations of the money laundering provisions in 18 U.S.C. Sec. 1956. The district court originally deferred decision on these motions until trial, but subsequently entered an order denying both claims. After the initial deferral, both Lee and Wesley Hsu pleaded guilty to crimes based on the money laundering statute, and now reassert their money laundering claims on appeal. We review district court interpretations of federal law de novo. Parkhurst v. Armstrong Steel Erectors, Inc., 901 F.2d 796, 797 (9th Cir.1990).
 
 
 32
 Lee and Wesley Hsu pleaded guilty to charges that they violated 18 U.S.C. Sec. 1956(a)(2) by transferring monetary instruments from the United States to the Republic of China "with the intent to promote the carrying on of a specified unlawful activity." The statute defines "specified unlawful activity" to include smuggling offenses under 18 U.S.C. Sec. 545. 18 U.S.C. Sec. 1956(c)(7)(D). Based on this definition, the government predicated the money laundering violation on the fishermen's intent to smuggle salmon into the United States in violation of 18 U.S.C. Sec. 545.
 
 
 33
 Section 545 is violated, however, only if the salmon is brought into the United States "contrary to law," and the government alleges that this requirement is satisfied because the salmon was imported contrary to the Act. Lee and Wesley Hsu argue that because Act violations are not included in the definition of "specified unlawful activity" in the money laundering statute, a section 545 smuggling violation cannot serve as the necessary "unlawful activity" in the money laundering charge if it is in turn based on an Act violation. Both attack what they label "creative charging" on the part of the government, and urge that the government "should not be permitted to do through the general smuggling statute what it could not otherwise do directly."
 
 
 34
 Lee and Wesley Hsu are correct in asserting that a money laundering charge under 18 U.S.C. Sec. 1956 could not be based solely upon an Act violation. In this case, however, the money laundering charges were clearly predicated upon a section 545 smuggling violation, which does qualify as a "specified unlawful activity." They would have us hold that section 545 smuggling offenses cannot support a money laundering charge if at any point the smuggling offenses are based on Act violations.
 
 
 35
 Their argument fails to recognize that such a chainlike effect will often result when money laundering allegations are based on section 545 violations. 18 U.S.C. Sec. 1956(c)(7)(D) expressly allows money laundering violations to be grounded in section 545 smuggling offenses. But section 545 only prohibits the importation of merchandise "contrary to law." Thus, one must always look to another statute, such as the Act, to determine whether a violation of section 545 has taken place. And 18 U.S.C. Sec. 1956 does not impose any exponential test; it does not require that smuggling violations under section 545 be based only upon certain enumerated statutes. Money laundering allegations may be based upon section 545 offenses, and section 545 offenses may be based upon the importation of merchandise that is contrary to any law. We therefore conclude that the government's charge was proper.
 
 
 36
 Lee and Wesley Hsu also contend that, in passing the Act, Congress intended to withdraw fish and wildlife from the definition of "merchandise" in 18 U.S.C. Sec. 545. If that were true, smuggling salmon into the United States in violation of the Act could not constitute the importation of "merchandise contrary to law" under the statute. The legislative history makes it clear, however, that Congress intended the Act to complement, and not to replace, the general smuggling provision. In amending the Act, Congress observed that the "felony penalty scheme for unlawful importations of wildlife is consistant [sic] with existing customs law. Even if this Act provided only a misdemeanor penalty for the unlawful importation of wildlife, such importations would be felonies under the customs law which prohibits knowing importations 'contrary [to] law.' " S.Rep. No. 123, 97th Cong., 1st Sess. 11, reprinted in 1981 U.S.Code Cong. & Admin.News 1748, 1758, citing 18 U.S.C. Sec. 545. We conclude that Congress desired that section 545 continue to apply to unlawful importations of fish and wildlife.
 
 
 37
 Because a section 545 violation may properly be based upon the smuggling of salmon contrary to the Act, the money laundering charges against Lee and Wesley Hsu were valid.
 
 
 38
 AFFIRMED.