**UNITED STATES of America,**

v.

**Robert McDOUGALL, Richard Goodfriend, Gregory Benney, Lyndon Haas, Michael Porter, and Waterfresh Foods, Inc. Defendants.**

**No. 97–CR–406.**

United States District Court,
N.D. New York.

Oct. 7, 1998.

Thomas J. Maroney, U.S. Atty., Syracuse, NY, for U.S.; Craig A. Benedict, Asst. U.S. Atty., of counsel.

Office of Bruce R. Bryan, Syracuse, NY, for Michael Porter; Bruce R. Bryan, of counsel.

Office of James R. McGraw, Syracuse, NY, for Waterfresh Foods, Inc.; James R. McGraw, of counsel.

Office of Salvatore Pavone, Syracuse, NY, for Gregory Benney; Salvatore Pavone, of counsel.

Office of Robert G. Wells, Syracuse, NY, for Richard Goodfriend; Robert G. Wells, of counsel.

## MEMORANDUM–DECISION & ORDER

McAVOY, Chief Judge.

Defendant Michael Porter ("Porter") is charged as part of a multi-defendant thirty-one count Superseding Indictment (the "indictment") with: (1) one count of conspiracy to violate the Lacey Act, 16 U.S.C. § 3372 *et seq.*, covering the period 1983 to the present; (2) three counts relating to the illegal export and import of the contaminated fish during 1995, 1996, and 1997, in violation of the Lacey Act, 16 U.S.C. §§ 3372(a)(2)(A) and 3373(d)(1)(A); and (3) sixteen counts of submitting false Canadian Customs forms that failed to disclose the existence of the fish that were transported in foreign commerce, during the period April 20, 1996 through May 9, 1997, in violation of the Lacey Act, 16 U.S.C. §§ 3372(d)(1), (2) and 3373(d)(3)(A)(i).

Porter now moves to dismiss the indictment. Co-defendants Waterfresh Foods, Inc. ("Waterfresh Foods"), Richard Goodfriend ("Goodfriend"), and Gregory Benney ("Benney"), also charged with conspiracy to violate the Lacey Act and with substantive offenses thereunder, have joined in Porter's motion to dismiss the indictment.

### I. The Government's Allegations

Defendants Goodfriend and Benney are commercial fishermen licensed pursuant to the New York State Department of Environmental Conservation ("DEC"). They are charged with catching and failing to return substantial quantities of eel and walleye from Lake Ontario and New York waters in violation of N.Y. COMP. CODES R. & REGS. tit. 6, § 37.1(b) (1997) ("Regulation 37.1")[1] and

---

1. Regulation 37.1(b) provides:

(b) Taking, possessing, offering or exposing for sale of American eel from Lake Ontario and

N.Y. Envtl. Conserv. Law § 11–1319(2) (Consol.1997) ("ECL § 11–1319")[2]. New York law prohibits commerce in these fish because of health and conservation concerns. The commercial fishing licenses of the defendants also prohibit these activities.

Aware of the ban prohibiting the sale of eel and walleye taken from these waters, Goodfriend and Benney subsequently sold the eel and walleye to a host of fish wholesalers and retailers, located within and outside New York, including Quality Lake Fish ("Quality Lake"), located in Brewerton, New York. Quality Lake thereafter resold substantial quantities of eel and walleye in interstate and foreign commerce to defendants Porter and Waterfresh Foods, a Canadian entity. Porter, a truck driver employed by Waterfresh Foods, was instructed to pick up the eel and walleye from Quality Lake and deliver them to Waterfresh Foods, where they would be resold worldwide to consumers in interstate commerce.

## II. Discussion

Porter raises numerous grounds for dismissing the indictment. The Court will address each argument *seriatim*.

## A. Predicate State Offense Requirement

■ Porter argues that the Lacey Act offenses charged in the indictment, which are predicated on violations of Regulation 37.1 and ECL § 11–1319, must be dismissed because his alleged conduct did not violate the state law or regulation that serve as the predicate for the Lacey Act offenses. Accordingly, Porter's motion to dismiss focuses on whether the Lacey Act counts are sustainable based upon Regulation 37.1 and ECL § 11–1319.

■ The Lacey Act serves as a federal tool to aid states in enforcing their own fish and wildlife laws by imposing federal sanctions for interstate or foreign commerce in fish and wildlife that have been taken, possessed, transported, or sold in violation of any state, federal, or foreign law. *See* S. REP. No. 97–123, at 2 (1981), *reprinted in* 1981 U.S.C.C.A.N. 1748, 1748–49. Accordingly, to prosecute a case under the Lacey Act, the government has the burden to first prove a violation of a valid state, federal, or foreign law or regulation. *See United States v. Sohappy*, 770 F.2d 816, 823 (9th Cir.1985), *cert. denied*, 477 U.S. 906, 106 S.Ct. 3278, 91 L.Ed.2d 568 (1986); *United States v. Powers*, 1989 WL 69255, at *2 (D.Idaho March 9, 1989), *aff'd*, 923 F.2d 131 (9th Cir.1990). In this sense, the underlying state, federal or foreign law or regulation serve as the trigger for enforcement of certain Lacey Act provisions. *See* 16 U.S.C. § 3372(a);. *see also United States v. Borden*, 10 F.3d 1058, 1062 (4th Cir.1993); *United States v. Miller*, 981 F.2d 439, 442 (9th Cir.1992), *cert. denied*, 508 U.S. 966, 113 S.Ct. 2945, 124 L.Ed.2d 693 (1993) ("Consequently, the federal law is not violated if the state law is not violated."). Other offenses, however, such as the false labeling and marking provisions, "stand on their own" and can independently sustain a Lacey Act prosecution. *See* S. REP. No. 97–123, at 4; 16 U.S.C. §§ 3372(b), (d).

Porter argues that because his conduct does not specifically violate Regulation 37.1 or ECL § 11–1319, the substantive Lacey Act charges that are predicated on state law must be dismissed. This argument, however, is inconsistent with the clear statutory language and federal precedent interpreting the Lacey Act.

The unlawful conduct that Porter is charged with has two distinct elements.

---

the St. Lawrence River and their tributaries upstream to the first barrier impassable to fish. (1) The taking, possessing, sale or exposure for sale of American eel from Lake Ontario, the St. Lawrence River and their tributaries upstream to the first barrier impassable by fish is prohibited, except that American eels may be possessed only when less than 14 inches in length for use as bait or for sale as bait.

(2) American eel unintentionally taken in violation of paragraph (1) of this subdivision must be returned to the water at once without unnecessary injury.

**2.** ECL § 11–1319(2) states:

2. Sale
a. Trout, including rainbow trout, Atlantic salmon, black bass, walleye and muskellunge shall not be bought and sold.

First, the eel and walleye must be taken, possessed, transported, or sold in violation of a valid state law or regulation. Second, the eel and walleye must be imported, exported, transported, sold, received, acquired or purchased in interstate or foreign commerce. *See* 16 U.S.C. § 3372(a)(2)(A). Subsequent provisions provide that felony criminal penalties can be imposed if Porter *knowingly* imported or exported the eel and walleye, *knowing* that they were taken, possessed, transported, or sold in violation of state law or regulations. *See* 16 U.S.C. § 3373(d)(1)(A); *see also United States v. Romano,* 929 F.Supp. 502, 504 (D.Mass. 1996). Because knowledge of the underlying state law or regulation is an element of the offense, the government must establish that Porter acted with knowledge that his actions were unlawful under a valid state law which was violated. *See United States v. Miranda,* 835 F.2d 830, 832 (11th Cir.1988); *United States v. Jonas Bros.,* 368 F.Supp. 783, 784 (D.Alaska.1974). The government is not required to prove that Porter *himself* violated the underlying state law or regulation to hold him liable under the Lacey Act's criminal penalties. *See United States v. Lee,* 937 F.2d 1388 (9th Cir.1991), *cert. denied,* 502 U.S. 1076, 112 S.Ct. 977, 117 L.Ed.2d 141 (1992). In *Lee,* the Ninth Circuit confronted this issue in an illegal salmon import operation and held:

> [I]t is irrelevant whether the [defendant] would be liable at all under the regulation. The [Lacey] Act's criminal penalty provision does not require that the [defendant] violated the regulation, but only that they took part in importing the salmon when they knew, or should have known, that the salmon had been taken in violation of the regulation.

*Id.* 937 F.2d at 1393.

Thus, it is sufficient for the government to establish that Porter acted with knowledge that either the commercial fishermen or his employer violated Regulation 37.1 and ECL § 11–1319 to sustain the Lacey Act offenses against him. *Accord United States v. Todd,*

735 F.2d 146, 151 (5th Cir.1984), *cert. denied,* 469 U.S. 1189, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985). Accordingly, Porter's motion to dismiss fails on this ground.

**B. Jurisdiction For False Labeling Offenses**

■ Porter next argues that the Lacey Act offenses charging the submission of false Canadian customs forms should be dismissed because the Court lacks jurisdiction. *See* 16 U.S.C. § 3372(d)(1), (2).

Once again, Porter's argument misconceives the inquiry and contradicts the clear statutory language of the Lacey Act. Specifically, Porter mistakes the filing of false export declarations for fish transported from New York to Canada as violations of Canadian law that cannot be prosecuted under the Lacey Act. Porter then compounds his error by misreading the holding of *United States v. Molt,* 599 F.2d 1217 (3d Cir.1979). In *Molt,* the court held that a foreign customs ordinance was "not for the protection of wildlife, but a revenue law," and therefore did not trigger the applicability of the Lacey Act. *Id.* 599 F.2d at 1219. The distinction made by the *Molt* court centered on the *purpose* of the underlying law, and did not, as Porter argues, limit the applicability of Lacey Act prosecutions based on violations of foreign law.[3]

■ The false labeling offenses provide an independent basis to sustain a Lacey Act violation and therefore do not require a violation of an underlying state or foreign law. *See* H. REP. No. 100–732 at 6 (1988); S. REP. No. 97–123 at 4. This finding is consistent with a plain reading of the statute and congressional intent to provide for an additional enforcement mechanism in light of the difficulty of proving that fish and wildlife were illegally taken in violation of foreign law. *See* H. REP. No. 100–732 at 6. In *United States v. Allemand,* 34 F.3d 923 (10th Cir.1994), the court confronted this issue in a case where defendants were charged under

---

**3.** This distinction prompted amendments to the Lacey Act in 1981 that broadened the scope of Lacey Act prosecutions where the underlying law or regulation had a dual purpose and did not solely address wildlife protection. *See* S. REP. NO. 97–123 at 6 (1981), *reprinted in* 1981 U.S.C.C.A.N. 1748.

the Lacey Act for filing false records in connection with wildlife exported from Minnesota to Canada. *See id.* 34 F.3d at 926; 16 U.S.C. §§ 3372(d), 3373(d)(3)(A)(i). The *Allemand* court held that the filing of false export forms itself was unlawful, independent of whether the defendants had a duty to complete the forms under applicable foreign law. *See Allemand,* 34 F.3d at 926. Thus, Porter's alleged submission of false Canadian customs forms constitutes a violation under the Lacey Act for which the Court has jurisdiction.

## C. Validity of Regulation 37.1

The statutory authority for enacting Regulation 37.1 is found in N.Y. ENVTL. CONSERV. LAW § 11–0325(1) (Consol.1997) ("ECL § 11–0325(1)"),[4] which establishes the criteria under which the DEC is authorized to promulgate regulations to control dangerous diseases. In challenging the validity of Regulation 37.1 as a necessary precursor to trigger the Lacey Act offenses, Porter argues that the Department of Health ("DOH") never certified that a disease existed with respect to American eels at the time that Regulation 37.1 was enacted. *See* Def. Mem. of Law at 27. Porter challenges both the DOH's finding that a disease existed and the sufficiency of the certification by the Commissioner of Health, prior to the promulgation of Regulation 37.1. *See id.* at 27.

### 1. Certification Requirement

As previously set forth, ECL § 11–0325(1) expressly requires that either the Commissioner of Health or the Commissioner of Agriculture and Markets certify "that a disease, which endangers the health and welfare of ... the human population, exists in any area of the state, or is in imminent danger of

being introduced into the state." N.Y. ENVTL. CONSERV. LAW § 11–0325(1); *see also United States v. Gehl,* 852 F.Supp. 1150, 1169 (N.D.N.Y.1994). This certification is a prerequisite to any measures or regulations promulgated by the DEC. *See Gehl,* 852 F.Supp. at 1169.

Porter argues that DOH certification was not issued prior to the promulgation of Regulation 37.1. This argument, however, is without merit as it overlooks a letter from Robert P. Whalen, Commissioner of Health, which certified that the "health and welfare of the human population may be endangered by the consumption of eels taken from Lake Ontario by reason of a concentration of certain specified pesticides, Mirex and Kepone." Gov't Ex. 6, Aff. of Lawrence C. Skinner at ¶ 14 (referencing Letter of Robert P. Whalen, Commissioner of Health, dated September 17, 1976). Immediately following this certification, the DEC issued an amended regulation that prohibited possession of American eel. *See id.* (Letter of Commissioner Peter A.A. Berle, dated September 20, 1976). These letters foreclose Porter's arguments regarding inadequate certification under ECL § 11–0325(1).

### 2. Disease Requirement

■ Even assuming proper certification was made pursuant to ECL § 11–0325(1), Porter contends that Regulation 37.1 is nevertheless invalid because no finding was made, as directed by the statute, that a disease existed or was in imminent danger of being introduced into the state. *See* N.Y. ENVTL. CONSERV. LAW § 11–0325(1). Porter's argument is based on a narrow and technical reading of the statutory text of section 11–

---

**4.** ECL § 11–0325(1) provides:

Whenever, it is jointly determined by the Department of Environmental Conservation ("DEC") and the Department of Health ("DOH") or the Department of Agriculture and Markets, and certification is made to the Commissioner of Environmental Conservation by the Commissioner of Health or the Commissioner of Agriculture and Markets, that a disease, which endangers the health and welfare of fish or wildlife populations, or of domestic livestock or of the human population, exists in

any area of the state, or is in imminent danger of being introduced into the state, the department shall adopt any measures or regulations with respect to the taking, transportation, sale, offering for sale or possession of native fish or feral animals it may deem necessary in the public interest to prevent the introduction or spread of such disease. The department may undertake such fish or wildlife control measures it may deem necessary to eliminate, reduce or confine the disease.

0325(1).[5] His argument, however, overlooks the *Gehl* decision which rejected the reading of ECL § 11–0325(1) that Porter now asks the Court to adopt. In *Gehl,* the court held that the phrase "may be endangered" in the case of chemical contamination, was "the functional equivalent of a statement that a disease exists or is in imminent danger of being introduced." *Gehl,* 852 F.Supp. at 1171. The Court is unpersuaded by Porter's argument and adopts the reasoning set forth in *Gehl.*

Because the court finds that Regulation 37.1 was validly promulgated pursuant to ECL § 11–0325(1), Porter's motion to dismiss the indictment on this ground is rejected.

### D. Federal Preemption

Porter next argues that the indictment should be dismissed because Regulation 37.1 was preempted by federal statutes and regulations promulgated by the Food and Drug Administration ("FDA") and the U.S. Fish and Wildlife Service.

#### 1. FDA Statutes

■ Porter first argues that 21 U.S.C. § 346 [6] provides for the FDA's *sole* authority to promulgate regulations that establish tolerance levels for unavoidable food contaminants, and therefore preempts state regulation in this area. Porter contends that FDA regulation of polychlorinated biphenyls ("PCBs"), one such industrial environmental contaminant, abrogates the right of states to establish more restrictive PCB tolerance levels. *See* Reduction of PCB Tolerances, 44 Fed.Reg. 38,330 (1979) (codified at 21 C.F.R. pt. 109). Accordingly, Porter concludes that the ban on American eel set forth in Regulation 37.1 is invalid because it conflicts with the less restrictive federal tolerance level for PCB concentration in food. *See* Def. Mem. of Law at 42–43. Porter applies the same reasoning in arguing that 21 U.S.C.

§ 381(e)(1) preempts state regulation regarding the exportation of food in compliance with the laws of the foreign country to which it is intended for export. *See* Def. Mem. of Law at 48. The Court finds both of these arguments unpersuasive.

■ First, an examination of the statutory language of section 346 does not support Porter's contention that the FDA intended to foreclose state regulation in this area. Indeed, such prohibitory language is conspicuously absent from section 346. When Congress intended to preempt state regulation in an area in which FDA regulation existed, it has done so expressly in the statutory text. *See* 21 U.S.C. 343–1 (national uniform nutrition labeling standards); 21 U.S.C. § 360k(a) (state and local requirements for devices intended for human use); *see also Processed Apples Institute v. Department of Pub. Health,* 402 Mass. 392, 522 N.E.2d 965 (1988) (while not directly reaching the issue of federal preemption, holding that section 346 did not abrogate a state law that established a chemical pesticide tolerance level that was more stringent than a comparable federal provision). Even in the case in which federal regulation exists in a given area, states are free to adopt more restrictive regulations in matters of particular local concern. *See Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 144, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963) (upholding state regulations governing the maturity of avocados sold in California). These regulations may not, however, unduly burden or discriminate against interstate commerce. *See id.* 373 U.S. at 153, 83 S.Ct. 1210.

Porter also misconstrues the federal regulations to erroneously conclude that the FDA has *exclusive* jurisdiction regarding the determination of PCB tolerance levels for food shipped in interstate commerce. The background material to the proposed regulations acknowledge that FDA regulation is limited to interstate commercial fishing and cannot

---

5. In his letter to the DEC Commissioner Berle, Health Commissioner Whalen states that "the population may be endangered by the consumption of eels taken from Lake Ontario by reason of a concentration of ... Mirex and Kepone." Gov't Ex. 6, Aff. of Lawrence C. Skinner at ¶ 13.

6. This statute is titled, "Tolerance for poisonous or deleterious substances in food, regulations," and provides for FDA regulation of acceptable environmental contaminants that are added to food or cannot be removed during a normal manufacturing process.

extend to intrastate activities such as recreational and sport fishing. This does not, however, necessarily provide the FDA with exclusive authority to fix national tolerance levels for the interstate sale of such fish to the extent that it precludes regulation by a state of its own waters. The Lacey Act itself evidences congressional intent that federal penalties and sanctions exist for violations of state environmental laws, thus precluding a finding of preemption. Indeed, the federal regulations expressly state:

> FDA does not have the authority either to close waters to fishing or to prohibit harvesting or possession of fish. Any actions to close waters to fishing would have to be instituted by State agencies.

*See* Reduction of PCB Tolerances, 44 Fed. Reg. at 38,333.

### 2. Fish and Wildlife Service Regulations

■ Porter next argues, absent legal precedent, that Regulation 37.1 is also preempted by federal Fish and Wildlife regulations, which he contends "permit[ ] the importation and shipment into the United States of eels taken from Lake Ontario." *See* Def. Mem. of Law at 51 (citing to Importation, Exportation, and Transportation of Wildlife, 50 C.F.R. § 14 (1997)). This argument misreads the text and scope of the regulation, which establishes "uniform rules and procedures for the importation, exportation, and transportation of wildlife." 50 C.F.R. § 14.1. The regulation is procedural in nature and does not, contrary to Porter's belief, provide for the interstate shipment of any specific fish or wildlife that may be prohibited under state law. *See id.*

Accordingly, Porter's argument that Regulation 37.1 is preempted by the FDA and Fish and Wildlife regulations is rejected.

### E. The Commerce Clause

■ Porter next argues that Regulation 37.1 violates the Commerce Clause because it fails to pass the strict scrutiny test established by the Supreme Court in *Maine v. Taylor*, 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986). Specifically, Porter contends that Regulation 37.1 does not serve a legitimate local purpose and its purpose could be served by a less discriminatory alternative that does not require a total ban on American eel. Porter, however, offers the Court nothing more than a summary of Commerce Clause jurisprudence and a rehash of the arguments previously analyzed and rejected by the *Gehl* court. While the *Gehl* court addressed the prohibition of salmon eggs under Regulation 37.1(a), its reasoning applies with equal force when applied to the commercial export and sale of American eel under Regulation 37.1(b). Consistent with the *Gehl* court, the Court will apply the strict scrutiny test set forth in *Taylor* in determining the constitutionality of Regulation 37.1(b). Further, because the Court finds that Regulation 37.1(b) passes the strict scrutiny standard set forth in *Taylor*, it necessarily follows that Regulation 37.1(b) pass constitutional muster under the less restrictive standard enunciated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) (applied in cases where the state regulation has an incidental burden on interstate commerce).

### 1. Legitimate Local Purpose

The record provides sufficient evidence that the DEC had a legitimate purpose, not based in economic protectionism, to prohibit the taking, possessing, sale, or exposure for sale, of American eel from certain New York waters. This prohibition was warranted in light of the significant chemical contamination levels found in the eel which threatened the health and welfare of the public. *See* Aff. of Lawrence C. Skinner, Ex. 6 at ¶ 13 ("[T]he ban on possession of fish containing excessive concentrations of chemical residues was extended to include American eels based primarily on findings reported by the Ontario Research Foundation."). This concern was echoed by DOH Commissioner Whalen, who subsequently certified that human consumption of American eel from Lake Ontario would endanger the health and welfare of the human population. *See id.* In rebuttal, Porter offers unsupported assertions and generalized allegations in a misguided effort to "second-guess" the well-supported findings of the state agencies charged with regu-

lating the environment of the state and the public welfare of its citizens. The Court accepts the findings of the DEC and holds that a legitimate local purpose for the ban on American eels existed. *Accord New York State Trawlers Ass'n v. Jorling*, 16 F.3d 1303, 1308 (2d Cir.1994) ("The protection of the environment and conservation of natural resources-including marine resources are areas of 'legitimate local concern.'"); *Gehl*, 852 F.Supp. at 1159.

## 2. Available Nondiscriminatory Means

Here, Porter boldly argues that Regulation 37.1(b) unduly discriminates against foreign countries that allow for consumption of American eel at levels otherwise prohibited by New York. As support, Porter provides a selective account of a period between 1978 and 1982, during which commercial fisherman legally sold American eel in international commerce, provided that the chemical residue concentrations complied with tolerance levels established by the foreign country. See Aff. of Lawrence C. Skinner, Ex. 6 at ¶ 22. Contrary to Porter's contention, Canada was excluded as a potential importer of American eel. *See id.* Thereafter, a number of countries complained that shipments of American eel had excessive chemical contamination levels and that commercial fishermen had misrepresented the contamination levels of the eels. Based upon the continued elevation of chemical residue contamination levels in American eel and the difficulty in assuring compliance by commercial fisherman with contamination levels established by other countries, the DEC adopted "a prohibition on all commercial taking, possession, sale, or exposure for sale of American eels from Lake Ontario." *Id.* at ¶¶ 22–32, 35. This prohibition is further justified by the need for increased testing of contamination levels in fish that would likely result in additional costs and would be "practically unenforceable by the State." *Gehl*, 852 F.Supp. at 1160. Accordingly, the Court finds that Regulation 37.1(b) does not violate the Commerce Clause, and Porter's motion to dismiss the indictment on that basis is denied.

## F. Vagueness and Overbreadth

Porter argues that Regulation 37.1 is unconstitutionally vague because it prohibits the importation of eel that is otherwise permitted under federal law, thus creating a "double standard" and the risk of an "arbitrary law enforcement standard." *See* Def. Mem. of Law at 65. He offers, however, no legal support for this broad assertion. Additionally, he argues that the Lacey Act prosecution is overbroad in that it reaches all forms of state regulation regardless of "its importance or diminimiss [sic] nature." *Id.*

### 1. Void–for–Vagueness

■■■ The void-for-vagueness doctrine requires that a statute sufficiently define for the ordinary person "what conduct is prohibited ... in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). In cases of economic or commercial regulations, courts have adopted a less strict vagueness test. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (noting that such regulations address a narrow subject matter and provide adequate notice and inquiry to affected parties); *Pro–Choice Network v. Schenck*, 67 F.3d 359, 373 (2d Cir.1994). Consequently, a regulation will be considered void-for-vagueness if it is so "vague and indefinite as really to be no rule or standard at all, or if it is substantially incomprehensible." *Ruiz v. Comm'r of the Dep't of Transp. of the City of New York*, 687 F.Supp. 888, 895 (S.D.N.Y.), *aff'd*, 858 F.2d 898 (2d Cir.1988).

The New York state courts have adopted a similar approach when determining whether an environmental regulation is void-for-vagueness. *See New York Coalition of Recycling Enters. Inc. v. City of New York*, 158 Misc.2d 1, 598 N.Y.S.2d 649 (Sup.Ct.1992) ("An act is void for vagueness only when it specifies no guide or standard at all and people of common intelligence must necessarily speculate as to its meaning and the conduct which is prohibited."). In *New York Coalition*, the court held that a local regulation dealing with commercial waste transfer

was not void-for-vagueness even though it contained "broad and flexible statutory terms." *Id.* 598 N.Y.S.2d at 658. The court also rejected plaintiffs' due process arguments, noting that

"The Constitution does not guarantee citizens the unrestricted privilege of conducting or engaging in business as they please. The State may, in the reasonable exercise of its police power, condition or restrict private businesses or *prohibit operation of some businesses entirely* to further its policies."

*Id.* 598 N.Y.S.2d at 656 (emphasis added) (citing *Rochester Gas & Electric Corp. v. Public Serv. Comm'n,* 71 N.Y.2d 313, 322, 525 N.Y.S.2d 809, 520 N.E.2d 528 (1988)).

Applying these standards, the Court finds that the clear prohibitory language of Regulation 37.1 is not unconstitutionally vague and does not conflict with the federal statutes and regulations cited by Porter. *See* section D, *supra. Accord United States v. McDougall,* 1998 WL 160834 at \*4 (N.D.N.Y. April 3, 1998). Indeed, Porter was not "compelled to grope and stumble in the dark and make arbitrary guesses" as to the lawfulness of his conduct given the unequivocal language expressed in Regulation 37.1. *New York Coalition,* 598 N.Y.S.2d at 658.

### 2. Overbreadth

■ Porter next contends that 16 U.S.C. § 3373 is overbroad because it criminalizes *any* violation of state regulation, regardless of its importance or magnitude. *See* Def. Mem. of Law at 65. Porter's argument overlooks that it is not generally the role of Congress to determine which violations of state law are important or insignificant in nature.

While the Lacey Act does not distinguish among various state laws and regulations, it does not criminalize *all* such violations. Criminal penalties under the Lacey Act are distinguished by the defendant's mens rea and can be either felony or misdemeanor in nature. *See* 16 U.S.C. §§ 3373(d)(1), (2). The statutes provide different penalties depending on whether the defendant acted "knowingly" or alternatively, "in the exercise of due care should know," that his conduct

violated a state law or regulation. *Id.* Additionally, the false labeling offenses require that the defendant act "knowingly." *See* 16 U.S.C. § 3373(d)(3). Therefore, a defendant, like Porter, can be prosecuted under the Lacey Act only if a state law or regulation was violated *and* he acted with the requisite culpability set forth in the statute. *See Lee,* 937 F.2d at 1396.

### G. Conspiracy Count

Porter alleges various defects in the indictment that warrant dismissal of the conspiracy count.

#### 1. Failure to State a Violation of Section 3373

■ Porter first argues that the indictment should be dismissed because it fails to state a violation of 16 U.S.C. § 3373. *See* Def. Mem. of Law at 69. A closer examination of the statute reveals that section 3373 merely sets forth the criminal penalties and sanctions for violations of the Lacey Act provisions and does not prohibit any specific conduct or activity. This misconception was noted by the *Gehl* Court:

The court admits to being somewhat perplexed by [the violation of section 3373(d)(1)(B) ] because at least on its face section 3373(d)(1)(B) just sets forth the criminal penalties for violations of certain Lacey Act provisions. . . . It does not independently proscribe any certain conduct under the [Lacey] Act.

*Gehl,* 852 F.Supp. at 1153.

Accordingly, the Court finds this argument to be without merit.

#### 2. Elements of the Conspiracy

■ The elements of a conspiracy include "(1) an agreement to accomplish an illegal objective, (2) coupled with one or more acts in furtherance of the illegal purpose, and (3) the requisite intent to commit the underlying substantive offense." *United States v. Atkinson,* 966 F.2d 1270, 1275 (9th Cir.1992), *cert. denied,* 507 U.S. 1004, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993). The agreement need not be explicit and may be inferred from the conduct of the parties and other

circumstantial evidence. *See United States v. Thomas,* 887 F.2d 1341, 1347 (9th Cir. 1989). Further, the government is not required to allege that all of the defendants committed a violation of a substantive Lacey Act provision or the underlying state law for conspiratorial liability to attach. *See id.* 887 F.2d at 1345, 1347. Rather, one can be held liable as a co-conspirator if "(1) the substantive offense was committed in furtherance of the conspiracy, (2) the offense fell within the scope of the unlawful project, and (3) the offense could reasonably have been foreseen as a necessary or natural consequence of the unlawful agreement." *Id.* 887 F.2d at 1345.

■ The Court finds that the indictment sufficiently alleges the elements of a conspiracy. It details an illegal objective (interstate transportation and sale of American eel and walleye taken in violation of New York law), an overt act (transportation and exportation of the fish), and the requisite intent (that the defendants knew that the taking and sale of American eel and walleye was illegal). The indictment also alleges the same degree of criminal intent for the conspiracy charge as required for the underlying offense. *See Thomas,* 887 F.2d at 1346. Furthermore, the indictment need not allege that the defendant knowingly violated the Lacey Act or the underlying state law; rather, it is sufficient to allege that the defendant knew that his conduct was unlawful. *See Todd,* 735 F.2d at 151; *Gehl,* 1995 WL 54401 at *19 (N.D.N.Y. February 2, 1995), *aff'd, United States v. Tempotech Indus. Inc.,* 100 F.3d 941 (2d. Cir.), *cert. denied sub. nom, Jackson v. United States,* 517 U.S. 1192, 116 S.Ct. 1682, 134 L.Ed.2d 784 (1996). In cases involving substances that pose a danger to the health and safety to the public, the Second Circuit has held that while a defendant must be aware that his conduct is unlawful, he need not be aware of the underlying environmental regulations in order to be held liable:

> When knowledge is an element of a statute intended to regulate hazardous or dangerous substances, the Supreme Court has determined that the knowledge element is satisfied upon a showing that a defendant was aware that he was performing the proscribed acts; knowledge of regulatory requirements is not necessary. [T]he probability of regulation is so great that anyone who is aware that he is in possession of [such substances] or dealing in them must be presumed to be aware of the regulation.

*United States v. Laughlin,* 10 F.3d 961, 965 (2d Cir.1993), *cert. denied sub. nom, Goldman v. United States,* 511 U.S. 1071, 114 S.Ct. 1649, 128 L.Ed.2d 368 (1994) (citing *United States v. International Minerals & Chem. Corp.,* 402 U.S. 558, 563–65, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971)).

Because Porter's arguments deal more directly with issues of proof and sufficiency of evidence that are best left for the jury, the Court denies Porter's motion to dismiss the indictment on this ground.

## H. Conflict With Canadian–U.S. Treaties

Porter last argues that various treaties between the United States and Canada conflict with the state regulation underlying the Lacey Act offenses, and therefore the indictment must be dismissed. Sadly, other than simply citing to a number of treaty agreements in the Attorney's Affidavit accompanying his motion, Porter's argument is wholly unsupported. *See* Attorney's Aff. at 24–25; Def. Mem. of Law at 74–75.

### 1. Great Lakes Fisheries Agreement

■ The first treaty cited by Porter is the Agreement Concerning Great Lakes Fisheries, Oct. 20, 1955, U.S.-Canada, 6 U.S.T. 2836 [hereinafter Great Lakes Agreement]. The Great Lakes Agreement was aimed at advancing fishery research in the Great Lakes and implementing a program that eradicated or minimized the sea lamprey population in these waters. *See* Great Lakes Agreement, art. IV, 6 U.S.T. at 2836. Contrary to Porter's belief, this agreement does not address American eels. Therefore, any conflict identified by Porter is illusory. Furthermore, the agreement explicitly provides for state regulation for fisheries located on the Great Lakes region. *See id.* at Art. X ("Nothing in this [agreement] shall be construed as preventing any of the States of the United States of America . . . from making

or enforcing laws or regulations within their respective jurisdictions...").

### 2. Fisheries Enforcement Agreement

 Porter next cites to the Agreement on Fisheries Enforcement, Sept. 26, 1990, U.S.-Canada, T.I.A.S. No. 11753 [hereinafter Fisheries Enforcement Agreement]. In the Fisheries Enforcement Agreement, the United States and Canada agreed to take appropriate measures to ensure that each did not violate the national fisheries laws and regulations of the other. *See* Fisheries Enforcement Agreement, art. I, T.I.A.S. No. 11753. The agreement does not mention American eels and was designed to "augment and make more effective coastal state enforcement of such laws and regulations." *Id.* (Preamble).

### 3. Great Lakes Water Quality Agreement

▬ The final treaty cited by Porter is the most comprehensive and reaffirms a continued effort on the part of the United States and Canada to "restore and enhance water quality in the Great Lakes System." Agreement on Great Lakes Water Quality, Nov. 22, 1978, U.S.-Canada, 30 U.S.T. 1383, T.I.A.S. No. 9257 [hereinafter Water Quality Agreement]. The Water Quality Agreement requires each country to "eliminate or reduce to the maximum extent practicable the discharge of pollutants" that endanger aquatic life in these waters. Notably, the agreement states that mirex (one of the pesticides present in American eel that prompted Regulation 37.1) be "substantially absent from water and aquatic organisms." *Id.* at annex I.

Porter fails to raise any genuine issues of conflict between these treaty agreements and the state laws and regulations at issue in this case. Accordingly, the Court rejects his motion to dismiss the indictment on this basis.

### III. CONCLUSION:

For all of the foregoing reasons, it is hereby

**ORDERED,**

that defendant Porter's motion to dismiss the indictment is DENIED, and it is further

**ORDERED,**

that the letter motions of defendants Waterfresh Foods, Goodfriend, and Benney to dismiss the indictment are also DENIED.

**IT IS SO ORDERED.**