OPINION OF THE COURT
Edward J. Greenfield, J.
When T.S. Eliot asked, in The Waste Land:
"What are the roots that clutch, what branches grow
"Out of this stony rubbish? * * *
"You cannot say, or guess, for you know only
"A heap of broken images, where the sun beats,
"And the dead tree gives no shelter”,
he was obviously not referring to the waste at dump sites and disposal facilities. The words are apt, however, for in this case, those who operate such facilities contend that their ability to metamorphize "stony rubbish” and to create new life from waste is being impeded, in contravention of law and constitutional principles.
This proceeding is a challenge to Local Laws, 1990, No. 40 of the City of New York dealing with the regulation of commercial waste. Plaintiff-petitioner New York Coalition of Recycling Enterprises, Inc. (NYCORE), an industrial trade association made up of the owners and operators of solid waste management and recycling facilities, together with individual operators, challenge the validity of the law and seek a preliminary injunction restraining the City from implementing the statute, and a declaratory judgment that the law is unconstitutional. The City has cross-moved, pursuant to CPLR 3211, to dismiss the complaint and petition (hereinafter referred to as the petition) in its entirety. Since the City has requested an adverse declaration that the enactment was lawful and proper and not in violation of any constitutional *6 provisions, the court has, pursuant to CPLR 3211 (c) converted the motion to one for summary judgment and has so advised the parties, who were permitted to submit and did submit additional papers.
BACKGROUND
In the City of New York private sanitation companies collect all commercial waste, including recyclable materials. Upon collection the waste material is delivered to transfer stations located throughout the five boroughs where the waste material is sorted, separated, recovered and/or prepared for re-use, re-sale or disposal. These transfer stations are divided into two types — "putrescible” transfer stations and "nonputrescible” transfer stations.
Putrescible transfer stations handle waste products from facilities such as restaurants, stores, office buildings and factories. These materials are mostly either biodegradable or recyclable. Nonputrescible stations handle nonbiodegradable materials consisting primarily of construction and demolition waste, which is for the most part recyclable. Such materials include dirt, stone, rock, brick, wood, steel, wallboard and metal. Both types of stations receive large amounts of other recyclable resources such as paper, cardboard, wood, glass and plastics, which are segregated and then sold in secondary markets. These recycling efforts have the commendable goal of conservation of diminishing resources and an increased useful life for existing landfill.
Thus, as the New York City Council Committee on Government Operations noted, transfer stations are "[a] vital component of the city’s management of its solid waste, especially in the area of recycling” (Supp Rep of Comm on Govt Operations, Intro No. 464-A, at 1332 [June 27, 1990]). Almost two thirds of the daily tonnage of solid waste generated by commercial property owners in the City is processed by members of NYCORE.
LOCAL LAW NO. 40
Local Law No. 40 amends Administrative Code of the City of New York § 16-130 et seq. in its regulation of putrescible and nonputrescible waste transfer stations. Jurisdiction of putrescible waste transfer stations was transferred by the law from the Department of Health (DOH) to the Department of Sanitation (DOS). Permit fees were increased, as were the *7 penalties to be imposed in enforcement proceedings. DOS was given enhanced regulatory authority, including the right to promulgate regulations with regard to siting specifications and the power to issue subpoenas.
Local Law No. 40 was first introduced on June 22, 1990 in the City Council by Councilmembers Gerges and Robles at the request of the Mayor. Simultaneously therewith a resolution was offered declaring an emergency to the health and safety of the City with regard to the operations of waste transfer stations. Both Resolution No. 444 and the proposed legislation, Intro No. 464, were referred by the Council Speaker to the Government Operations Committee. The regular weekly agenda of Committee meetings was distributed prior to the introduction of Intro No. 464. A Committee meeting was scheduled for Wednesday, June 27, 1990. An addendum agenda was issued on June 26, 1990 notifying Councilmembers and the public that the Government Operations Committee would be considering the bill and the resolution at the following day’s meeting.
The language of the proposed law had been revised and at the Committee meeting the proposed amendments were read out and discussed. The Committee heard testimony in favor of and in opposition to new Intro No. 464-A and Resolution No. 444. Witnesses were questioned. Appearing before the Committee were representatives of the City Departments of Sanitation, Law, and Office of Management and Budget, as well as a representative of the Brooklyn Borough President, various community board officials, residents of areas affected by transfer stations, individual station owners and petitioner NY-CORE, which opposed the enactment and the declaration of an emergency.
Upon conclusion of the hearing the Committee unanimously voted to approve Intro No. 464 as amended and forwarded it to the Council with a report recommending its adoption. Resolution No. 444 was also unanimously approved and forwarded to the Council with a favorable recommendation.
The Council’s next scheduled session was on Saturday, June 30, 1990. The Mayor certified the necessity for immediate passage of Intro No. 464-A and the full Council then passed the bill along with Resolution No. 444 by a vote of 34 to 0.
Thereafter notice was given in the City Record on July 6, 1990 and in the New York Post on July 7, 1990 that a public hearing would be held on July 12, 1990 at City Hall with *8 regard to Intro No. 464-A. At the mayoral hearing no opposition to the proposed legislation was presented. The Mayor signed the bill into law and Intro No. 464-A became Local Law No. 40.
After the passage of Local Law No. 40 and following the statements made at the hearings, the City undertook a review of the law to identify any environmental effects. The Department of City Planning and the Department of Environmental Protection, after inquiring, found that Local Law No. 40 would have no significant effect on the environment and issued a negative declaration, which was then forwarded to the City Council for review and approval. On December 20, 1990, Resolution No. 689 to adopt the negative declaration was considered and approved unanimously by both the Government Operations Committee and the full Council.
THE ISSUES
Petitioners raise both procedural and substantive objections to Local Law No. 40. The procedural challenge may be found in the first, second, third, fifth, sixth, ninth and sixteenth causes of action, which are at the heart of the CPLR article 78 proceeding. Petitioners allege that the City did not follow appropriate procedures under the State Environmental Quality Review Act (SEQRA) (ECL art 8), City Environmental Quality Review (CEQR), the Uniform Land Use Review Procedure (ULURP) and that the Municipal Home Rule Law and City Council Rules as to notice, hearings and committee assignment were violated. The remaining causes of action are the basis on which a declaratory judgment is sought that the statute is unconstitutional for violation of due process, equal protection, vagueness and improper delegation and excessive punishment.
THE PROCEDURAL OBJECTIONS
Applying the ruling of the Court of Appeals in Society of Plastics Indus, v County of Suffolk (77 NY2d 761, 773) in assessing standing to sue under SEQRA, a party must show that the adverse affect upon it falls within the "zone of interests” sought to be promoted. Applying this test, the court finds that none of the petitioners have standing to sue thereunder. The perceived environmental harms claimed are not different in kind or degree from those affecting the general community. (Matter of Mobil Oil Corp. v Syracuse Indus. Dev. *9 Agency, 76 NY2d 428, 433.) The concerns which impact on the individual petitioners are economic, not environmental, serving to increase their costs of doing business. This does not create standing to raise SEQRA or CEQR claims.
The court further finds that enactment of Local Law No. 40 was an emergency action exempt from the requirements under State and City environmental review statutes. (Matter of Board of Visitors — Marcy Psychiatric Ctr. v Coughlin, 60 NY2d 14; 6 NYCRR 617.1 [q] [4]; CEQR § 4 [h].) The finding of a health emergency was not irrational, arbitrary or capricious, but was amply supported by the record, which clearly indicates a perceived increased risk to the health of the citizens of the City. More than half of the putrescible stations in the summer of 1990 were found to have serious health code violations. The Department of Environmental Protection concluded that Local Law No. 40 would have no significant effect on the environment, and issued a negative declaration which was approved by the City Council. The negative declaration was timely, and the lead agencies accurately determined that the shift of authority over the transfer stations would have no impact on their operations. It is clear that the agencies did take the required "hard look” at the environmental consequences to support their finding of no significance.
The challenge to the notice and hearing procedures is without merit. There is no constitutional right for members of the public generally to be heard by public bodies making decisions of policy. (Minnesota Bd. for Community Colls. v Knight, 465 US 271, 283.) Petitioners were in fact present and participated at the hearings. Further, Local Law No. 40 is not a land use regulation and does not change the zoning law. It does permit the Department of Sanitation to promulgate siting regulations. Local Law No. 40 represents a proper exercise of police powers to regulate for reasons of health and public safety. Petitioners have failed to establish that procedures employed to enact Local Law No. 40 were arbitrary, capricious or contrary to law and those causes of action asserting a procedural challenge must be dismissed.
THE CONSTITUTIONAL CHALLENGES
There remains only the declaratory judgment portion of the petition to consider. Petitioners raise a series of constitutional challenges which fall into five categories: (1) substantive due process; (2) equal protection; (3) taking or deprivation of *10 property rights; (4) delegation and vagueness; and (5) excessive punishment. Local Law No. 40 is attacked as facially unconstitutional. There is also a challenge to its application.
The City argues that the "as applied” challenges are not ripe for determination and present no justiciable controversy at this time. The court agrees. Such claims are all dependent on the regulations to be adopted, which are not before the court and are purely a matter of speculation. As the agencies reviewing Local Law No. 40 for SEQRA have pointed out, the statute itself does not affect the operations of waste transfer stations. Nor have petitioners come forward with any specific factual support for their conclusory claims of constitutional deprivation stemming from the application of the statute.
CPLR 3001 provides for the rendering of a declaratory judgment as to the rights and legal relations of the parties to a justiciable controversy. "[CJourts do not make mere hypothetical adjudications, where there is no presently justiciable controversy before the court, and where the existence of a 'controversy’ is dependent upon the happening of future events” (Prashker v United States Guar. Co., 1 NY2d 584, 592; Park Ave. Clinical Hosp. v Kramer, 26 AD2d 613-614, affd 19 NY2d 958). Since the "as applied” challenge is dependent upon the regulations, which were not promulgated when this proceeding was commenced, these objections to the statute are premature and do not present a justiciable controversy ripe for a declaratory adjudication. The appropriate course would be to await adoption of the regulations and exhaust all available administrative remedies before resort to the courts is made (Pennell v San Jose, 485 US 1, 10-11; Church of St. Paul & St. Andrew v Barwick, 67 NY2d 510, 518, cert denied 479 US 985). Consequently, all "as applied” constitutional challenges are dismissed.
With respect to the facial challenges to the constitutionality of Local Law No. 40 "[ajnalysis starts by recognizing that legislative enactments are presumed valid and that one who challenges a statute bears the burden of proving the legislation unconstitutional beyond a reasonable doubt” (Rochester Gas & Elec. Corp. v Public Serv. Commn., 71 NY2d 313, 319-320; Lighthouse Shores v Town of Islip, 41 NY2d 7, 11).
The eighth cause of action asserts that Local Law No. 40 violates substantive due process in that it is not substantially related to any important governmental interest and does not promote the general welfare because it undermines efforts to *11 protect the environment. While petitioners do not offer specifics on how the environment will be adversely affected by the bill, the primary thrust is that the legislation would facilitate closure of waste transfer stations and that such closure would reduce recycling efforts and result in increased traffic and noise at existing stations. The City argues that the collection and disposal of garbage and waste presents serious health concerns that have long been the province of municipal regulation, and that this exercise of the police power was enacted to enhance enforcement and was found by the reviewing agencies to have a positive effect on the environment.
Petitioners have not established that the bill is harmful to the environment; instead of presenting evidence they have rested on conclusory allegations of harm. The court’s finding that the negative declaration under SEQRA and CEQR was rational substantially undercuts petitioners’ premise.
It is beyond question that garbage, with its noxious odors, its decay, and the vermin it attracts, is a "deleterious substance” which is "unhealthy” and an "actual or potential nuisance” with "obvious hazards” (Wiggins v Town of Somers, 4 NY2d 215, 221; City of Rochester v Gutberlett, 211 NY 309, 315-316). Even if "nonputrescible” rubbish, it can be unsightly, toxic, and space consuming. It is a menace to public health, and waste collection and disposal have long been subject to regulation under the police powers (supra; Moran v Village of Philmont, 147 AD2d 230, appeal dismissed 74 NY2d 943).
Legislation satisfies the requirement of substantive due process if it is reasonably related to a legitimate governmental objective. (Village of Belle Terre v Boraas, 416 US 1.) "A legitimate governmental purpose is, of course, one which furthers the public health, safety, morals or general welfare” (French Investing Co. v City of New York, 39 NY2d 587, 596, appeal dismissed and cert denied 429 US 990).
Clearly Local Law No. 40, which was enacted to enhance the existing regulatory structure for waste transfer stations, is a police measure directed at improving the health and safety and general welfare of the public by shifting administrative responsibility. As such, it is reasonably related to a legitimate governmental objective and comports with due process. As the Court of Appeals noted in Rochester Gas & Elec. Corp. v Public Serv. Commn. (71 NY2d, at 322, supra), "[T]he Constitution does not guarantee citizens the unrestricted privilege of *12 conducting or engaging in business as they please. The State may, in the reasonable exercise of its police power, condition or restrict private businesses or prohibit operation of some businesses entirely to further its policies.” Local Law No. 40 is a reasonable exercise of police power in an area that has long been subject to regulation.
The 15th cause of action charges that Local Law No. 40 denies equal protection under the Federal and New York State Constitutions in that it discriminates against transfer stations by restructuring their activities, but not that of other industries which may have significant environmental impact. The City responds that in the area of economic regulation it need not address all problems of society at once so long as rational distinctions are drawn, and that in this instance the City has a legitimate purpose in putting forth this measure.
Legislation will be declared unconstitutional on equal protection grounds only where the " 'varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature’s actions were irrational’.” (Pennell v San Jose, 485 US 1, 14, supra; accord, Elmwood-Utica Houses v Buffalo Sewer Auth., 65 NY2d 489.) As the court has found above, the enactment is related to a legitimate purpose. The City may address the environmental concerns of the waste transfer industry separate from other industries that may impact upon the environment. This disparate treatment of other classes will not give rise to complaint for deprivation of equal protection (Matter of Engelsher v Jacobs, 5 NY2d 370, 374).
Here the entire waste transfer industry was placed under one coherent scheme of regulation, where before different segments of the industry were subject to regulation by different agencies. If anything, this measure should promote equal protection.
The petition alleges two taking claims in the fourth and seventh causes of action. The fourth cause of action charges that Local Law No. 40 deprives owners of transfer stations of the right to continue to operate their businesses and use their properties in an economically viable manner by taking away petitioners’ vested right to operate their transfer stations in M-l, M-2 and M-3 zones, and has rendered the business unsalable or salable only at severely reduced prices. The City maintains that there is no vested right to continue in busi *13 ness, and that a proper exercise of the police power may force some to go out of business. Further, Local Law No. 40 on its face does not prohibit transfer station operations in M-l, M-2 or M-3 zones. In short, the City contends that the law is not confiscatory and that no taking results from its enactment.
A reading of the statute indicates that it does not deprive petitioners of the right to continue in business in M-l, M-2 or M-3 zones. It merely authorizes the DOS to adopt siting regulations. As repeatedly observed, the statute itself will not affect operations of transfer stations in these zones. While the regulations may impact on the operation of some transfer stations, they were not adopted when this matter was instituted and are not before the court on this application. It would be utter conjecture to speculate on their contents. Such speculation is not enough. "Possible taking” is not the equivalent of a taking. This is further confirmed by the lack of evidence put forward on the conversion of the motion to one for summary judgment.
Moreover, petitioners do not have immunity against the exercise of the police power because their businesses were originally established in full compliance with then existing laws (Queenside Hills Realty Co. v Saxl, 328 US 80; Matter of Engelsher v Jacobs, supra). A statute regulating the use of property effects a taking only if it "does not substantially advance legitimate state interests * * * or denies an owner economically viable use of his land” (Agins v Tiburon, 447 US 255, 260; French Investing Co. v City of New York, supra). The court has found the statute to advance a legitimate State interest, and petitioners provide no proof that there is no other economically viable use for the land. Indeed, their operations continue as before. While the new regulatory scheme may eventually increase the cost of doing business, that does not render it invalid (Huggins v City of New York, 126 Misc 2d 908, 911).
The seventh cause of action alleges another taking in that permits previously issued by DOH to putrescible waste transfer stations effective through March 31, 1991 will be rendered invalid by the new legislation. The City disputes that the new law will have any effect on the DOH permits until DOS adopts regulations and then there would be a 30-day period to apply for DOS permits and during the pendency of the application the DOH permit would remain in effect. The conversion of the motion to summary judgment occurred long after the March 31, 1991 expiration and petitioners have not come forward *14 with any proof to substantiate the claim that the old permits were prematurely retired. This challenge cannot be sustained on this barren record.
The petitioners, in the 11th, 13th and 14th causes of action, raise the objection that the statute improperly delegates responsibility to DOS without providing statutory standards for the exercise of its discretion. In particular, they take issue with (1) the powers granted to impose and enforce penalties as DOS chooses; (2) the power to require permit applicants to provide DOS with such information as DOS determines to be necessary; and (3) the power to require the enclosure of putrescible solid waste transfer stations by a date to be determined by DOS and to rescind an order sealing, securing or closing property and equipment upon the giving of certain assurances. In each instance petitioners contend that it was "possible and reasonable to have circumscribed the authority more closely.” The City maintains that the Council has the right and authority to delegate functions to DOS and that powers delegated need not contain detailed guidelines, only a primary standard, and that in each instance this was done.
In Matter of Levine v Whalen (39 NY2d 510, 515), the Court of Appeals held "there is no constitutional prohibition against the delegation of power, with reasonable safeguards and standards, to an agency or commission to administer the law as enacted by the Legislature.” The legislative standard to be provided does not mean a "precise and specific formula.” The standards and guidelines need only be prescribed in so detailed a fashion as is reasonably practicable in light of the complexities of the particular area to be regulated, since necessity and practicality fixes a point beyond which it is unreasonable and impracticable to compel the Legislature to prescribe detailed rules (supra; accord, Matter of Frishman v Schmidt, 61 NY2d 823, 825).
Examining the provisions challenged herein, the court finds that in each case the Legislature enunciated a standard or policy which was to guide DOS conduct; that these standards were not as precise as petitioners would like does not render them constitutionally infirm (Matter of Levine v Whalen, supra). Here, the hearings indicate that the Legislature wanted to utilize the expertise of the agency to implement the broad brush strokes of the legislative policy by allowing the agency a certain latitude in fulfilling its mandate.
*15 As this court has previously observed in New York Horse & Carriage Assn. v City of New York (144 Misc 2d 883, 886-888):
"The statute is void only if it specifies no guide or standard at all (Coates v City of Cincinnati, 402 US 611, 614), but not if there is a comprehensible normative standard capable of interpretation. Statutes, of necessity, must speak in generalities, leaving application as to each specific case to the reasonableness and discretion of executive, administrative, and judicial officers. '[I]t is not necessary that the Legislature supply administrative officials with rigid formulas in fields where flexibility in the adaptation of the legislative policy to infinitely variable conditions constitute the very essence of the programs. Rather, the standards prescribed by the Legislature are to be read in light of the conditions in which they are to be applied.’ (Matter of Nicholas v Kahn, 47 NY2d 24, 31.) * * *
" 'The cornerstone of administrative law is derived from the principle that the Legislature may declare its will, and after fixing a primary standard, endow administrative agencies with the power to fill in the interstices in the legislative product by prescribing rules and regulations consistent with the enabling legislation’.”
Here section 4 of Local Law No. 40 provides that applicants produce such information as DOS determines "to be necessary for the department to fulfill its duties under this title.” It further illustrates the type of information required to include "financial statements” and "any annual or quarterly report” required to be filed with DEC. There is a framework and standard for DOS to follow — the information must be necessary to fulfill its duties and certain types of data are provided as a guide. The Legislature did not have to delineate specifically all data to be required; deference to the agency’s expertise in scoping the area was reasonable.
Likewise section 8 of Local Law No. 40 empowers DOS to rescind an order sealing, securing or closing premises or equipment when the operator or owner thereof provides DOS with "assurances that the conditions which caused the issuance of such order have been corrected and will not reoccur and any necessary permit will be obtained.” This is not some vague assurance, it is a specific representation that the offending condition has been corrected, that it will not recur and that permits will be obtained. Once again DOS is vested with discretion while the statute provides the standards to be applied in the exercise of that discretion.
*16 The Local Law No. 40 provision regarding enclosure of putrescible waste transfer stations, i.e., section 4, is not improper delegation. Here too, the regulations to be adopted in this area must be consistent with the Health Code and DEC regulations. It permits DOS to exempt from the enclosure provisions transfer stations which have "no[ ] adverse[ ] affect [on] residential area[s]” and that the station not exceed the provisions of the DEC regulations; clearly limits are set on the conduct of DOS in issuing exemptions that provide a standard to be followed.
Nor will these terms be stricken under a void-for-vagueness analysis. Legislatures have regularly used "broad and flexible statutory terms like 'reasonableness’, 'due process’, or 'unconscionable’, which are designed to permit a considerable degree of judgment and discretion to fit the circumstances, [so] we are certainly not compelled to grope and stumble in the dark and make arbitrary guesses as to the meaning of such terms as are here presented.” (New York Horse & Carriage Assn. v City of New York, supra, at 887.) An act is void for vagueness only when it specifies no guide or standard at all and people of common intelligence must necessarily speculate as to its meaning and the conduct which is prohibited (United States v Harriss, 347 US 612, 617; People v Cruz, 48 NY2d 419, appeal dismissed 446 US 901). The Legislature is free to use terms, without providing their definition, in which case the court will give the words their commonly accepted meaning or read them in context (People v Illardo, 48 NY2d 408). As noted above, the statute does provide a standard and the terms may be given their commonly accepted meaning, which when placed in context, do not require speculation.
Petitioners raise a further due process claim, that the information to be provided to the agency would violate their right to privacy should it be disclosed in response to a Freedom of Information Law request. This claim is meritless. There is little or no expectation of privacy in business records in such an extensively regulated industry, especially for documents prepared in compliance with regulatory requirements (Matter of Glenwood TV v Ratner, 103 AD2d 322, 328, affd 65 NY2d 642). Indeed, one of petitioners has already been defeated in its attempt to block a City agency from obtaining its business records relevant to regulating the private carting industry (Allied Sanitation v Aponte, NYLJ, Sept. 14, 1989, at 23, col 4). Moreover, trade secrets obtained in the course of regulatory compliance are exempt from disclosure to the *17 public under Public Officers Law §87 (2) (d), obviating the problem.
The claim of improper delegation as to enforcement and penalties is spurious. DOS does not impose fines and penalties. These are imposed by adjudicatory bodies — Criminal Court or the Environmental Control Board. In either case it would be inappropriate to tie the hands of the fact finder in assessing a penalty to fit the crime. In the area of enforcement, it is customary and usual for the Legislature to leave to the adjudicatory body discretion in imposing penalties as the circumstances warrant within a particular range of choices. That is precisely what the City Council has done in this instance.
Thus, there has been no improper delegation, as the law provides standards and policies to serve as guidelines for exercise of agency discretion and the terms employed are not void for vagueness.
Lastly, we reach the claims of cruel and unusual punishment. Petitioners assert in the 10th cause of action that the criminal sanctions set forth in the statute are arbitrary and capricious because they are grossly disproportionate to the nature of the offense. Specifically, petitioners cite the misdemeanor of operating without a permit in violation of the law and regulations, punishable by imprisonment of up to one year, a fine not to exceed $25,000 and impoundment and forfeiture of property and equipment used in the commission of a crime. The City contends that similar statutes on the State and Federal levels have comparable if not more severe penalties for illegal transfer station operations or conduct detrimental to the public health and safety.
Within the context of the existing regulatory structure, such offenses may be a felony (see, e.g., Resource Conservation and Recovery Act [RCRA], 42 USC § 6928 [d] [a felony punishable by two to five years’ imprisonment]; NY City Charter § 562).
The fines to be imposed under comparable statutes also are stricter than here enacted (see, RCRA, 42 USC § 6928 [d] [$50,000 per day]; ECL 71-2703 [$1,000 to $5,000 per day]; ECL 71-2705 [$25,000 penalty plus $25,000 per day]). By no stretch of the imagination can the misdemeanor offense with its one-year term of imprisonment and $25,000 fine be perceived as disproportionate on its face. This does not mean that in a particular case these penalties might not prove excessive, but such challenge should be raised in the context of the particular action, not in the abstract.
*18 With respect to the impoundment of property used in criminal activity, the City may abate unlawful activity by seizing such property pending prosecution and forfeiture (Warden v Hayden, 387 US 294; People v Chiagles, 237 NY 193; Santora Equip. Corp. v City of New York, 138 Misc 2d 631). Procedural due process will not be violated if, in exigent circumstances, property may be seized by law enforcement officials without notice, provided the owner is afforded a prompt postdeprivation hearing (see, Hodel v Virginia Surface Min. & Reclamation Assn., 452 US 264; Calero-Toledo v Pearson Yacht Leasing Co., 416 US 663; North Am. Cold Stor. Co. v City of Chicago, 211 US 306). Here Local Law No. 40 requires a hearing within three business days and a determination within four days thereafter.
The 12th cause of action claims that the impoundment procedures are inadequate in that there is no adequate notice and opportunity to be heard and that the seizure will destroy ongoing businesses.
The impoundment procedures of Local Law No. 40 do provide for a timely hearing. Three days is far shorter than periods previously found acceptable (see, United States v Von Neumann, 474 US 242 [36 days]; Eagle v Koch, 471 F Supp 175 [30 days]). No evidence to support the proposition that a one-week closure will destroy a business is set forth beyond conclusory speculation.
Petitioners have failed to demonstrate in what manner the statute creates a cruel and unusual punishment, in that the imprisonment, fines and impoundment are all within the limits of comparable regulatory structures. The 10th and 12th causes of action cannot be sustained.
The declaratory judgment should be granted to the City, declaring Local Law No. 40 to be facially constitutional and not a deprivation of due process, equal protection, unlawful taking, void for vagueness, improper delegation of authority, nor cruel and unusual punishment.
Accordingly, the application for CPLR article 78 relief is denied and the petition is dismissed. The motion for summary judgment is granted to the defendant and the statute is declared to be facially constitutional. The motion to dismiss the "as applied” constitutional challenges is granted. The motion for preliminary injunction is denied as academic.