OPINION OF THE COURT
Rosalyn Richter, J.
In this consolidated CPLR article 78 proceeding,[1] petitioners are five companies seeking to operate solid waste transfer stations in the Bronx, Brooklyn and Queens. In November 2004, respondent New York City Department of Sanitation (DOS) *278 promulgated new rules governing the issuance of permits for solid waste transfer stations. After these rules went into effect, DOS denied the permit applications of some of the petitioners and told the others that their proposed facilities would be subject to the new rules. In this proceeding, petitioners challenge the validity of the new regulations. Alternatively, petitioners contend that if the new rules are upheld, they should not be applied to petitioners’ proposed transfer stations. For the reasons discussed herein, the article 78 petitions are denied.
A solid waste transfer station is any structure, building or land where solid waste is received for the purpose of subsequent transfer to another location. There are two types of solid waste transfer stations: putrescible and nonputrescible. Putrescible transfer stations receive organic materials susceptible to decay whereas nonputrescible transfer stations receive inorganic wastes that do not decay. A putrescible transfer station is typically an enclosed facility where putrescible waste is received, sorted and transferred to vehicles for transport to a final disposal site. Nonputrescible transfer stations are usually unenclosed facilities that sort and separate the waste for recycling purposes. Nonputrescible transfer stations can be either construction and demolition (C & D) transfer stations, which process debris such as concrete, asphalt, plaster, wood, sheet-rock, metal, glass and electrical wires and cables, or fill material transfer stations, which receive clean usable material consisting of earth, soil, rock, gravel, sand and stone.
In 1990, the New York City Council enacted Local Law No. 40 (1990) of the City of New York which gave DOS increased regulatory authority over private transfer stations. One of the provisions of this law directed DOS to adopt rules establishing requirements for the siting of transfer stations in relation to other transfer stations, residences and other premises for which such requirements may be appropriate. DOS subsequently promulgated rules in 1991 and 1994 that purportedly complied with Local Law 40. However, a coalition of community groups disagreed and in 1997, they brought a proceeding to compel DOS to promulgate rules in compliance with the law’s directives. The trial court found that DOS’s existing regulations were inadequate because they did not sufficiently address transfer stations’ proximity to other such stations, residences, schools and parks. The court directed DOS to commence without delay steps leading to the adoption of such rules. (Neighbors Against Garbage v Doherty, Sup Ct, NY County, Mar. 10, 1997, *279 Index No. 109023-1996.) The Appellate Division, First Department, affirmed and held that the existing rules did not address the problem of clustering of transfer stations in particular neighborhoods and their proximity to residences, schools and parks. (Matter of Neighbors Against Garbage v Doherty, 245 AD2d 81 [1st Dept 1997].)
In October 1998, DOS promulgated additional regulations in compliance with the court’s order (the 1998 siting rules). For nonputrescible stations, these rules prohibited such new facilities in, and the expansion of existing such facilities into, a zoned Ml district, or within 400 feet of a residential district, public park, school, or other nonputrescible transfer station. Facilities already lawfully operating within 400 feet of such locations were allowed to remain but could not expand any closer to those locations. Facilities already operating within an Ml district were permitted to expand within such district, subject to the above 400-foot buffer requirements. In addition, fully enclosed nonputrescible transfer stations located in a zoned M2 or M3 district that exported their solid waste by rail or barge were exempted from the buffer requirement.
For putrescible transfer stations, the 1998 siting rules set forth identical restrictions and exemptions, except that: (i) there was no requirement for a buffer distance between a putrescible transfer station and any other transfer station, and (ii) the method of computing distance between a transfer station and a residential district, school or public park was measured from the structure enclosing the waste processing operations, rather than from the transfer station site boundary. The 1998 siting rules also authorized DOS to grant variances from the siting restrictions for both putrescible and nonputrescible stations where an applicant could show that unique conditions or mitigating measures substantially addressed any potential significant adverse environmental impacts.
After the 1998 siting rules went into effect, another group of community organizations filed a lawsuit challenging the rules as insufficient. In an October 18, 2001 decision, the trial court in that proceeding identified several infirmities in the 1998 siting rules. In particular, the court noted that the rules (i) allowed nonconforming transfer stations to continue to operate indefinitely; (ii) lacked appropriate buffer distances between putrescible transfer stations and other transfer stations; and (iii) failed to address the inordinate clustering of transfer stations in areas near residences, schools and parks. (Organization of *280 Waterfront Neighborhoods v Carpinello, Sup Ct, NY County, Oct. 18, 2001, Index No. 103661-1999.) The court’s decision noted that DOS had agreed that the 1998 siting rules were inadequate and had pledged to promulgate new and more restrictive regulations concerning clustering of transfer stations and buffer distances. In light of DOS’s representations, the court dismissed the proceeding as moot, without prejudice to renewal should DOS fail to follow through on the implementation of new siting regulations.
In or about late 2002, DOS sent letters to several of the petitioners advising them that DOS would not be issuing any new permits to nonoperating transfer stations. DOS stated that based on findings of a preliminary waste management study, it had determined that the City currently had sufficient private transfer station capacity and thus DOS was terminating review of petitioners’ applications. This moratorium on new transfer stations was subsequently the subject of two article 78 proceedings brought by petitioners Jamaica and Fontana. In March 2003, Jamaica brought a proceeding against DOS, which was dismissed in January 2004 by Justice Sherry Klein Heitler. (Jamaica Recycling Corp. v City of New York, Sup Ct, NY County, Jan. 8, 2004, Index No. 104115-2003.) Meanwhile, in May 2003, Fontana brought its own proceeding against DOS. In August 2003, Justice Diane Lebedeff granted the petition in part and held that DOS’s 2002 moratorium and denial of Fontana’s permit application constituted improper rulemaking. (Fontana Transfer Sta. v Doherty, Sup Ct, NY County, Aug. 6, 2003, Index No. 106775-2003.) In November 2004, Justice Heitler, on reargument, reversed her decision and granted Jamaica’s petition. Justice Heitler adopted the reasoning of Justice Lebedeff and found that the moratorium amounted to illegal rulemaking by DOS. (Jamaica Recycling Corp. v City of New York, Sup Ct, NY County, Nov. 23, 2004, Index No. 104115-2003.) In their decisions, both judges directed DOS to continue to process Jamaica’s and Fontana’s permit applications.
In December 2003, DOS adopted interim siting restrictions (the interim siting rules) which remained in effect until October 20, 2004 pending promulgation of the final siting rules. These interim rules contained further restrictions on the permitting of transfer stations. Under the rules, DOS was prohibited from issuing permits for new or expanded fill material and C & D debris transfer stations. Expansion of putrescible transfer stations was generally allowed, except that in communities with *281 the highest concentration of existing transfer stations, expansion was only permitted if the applicant obtained offsets in the form of corresponding reductions of existing transfer station capacity in the same community district. In addition, the interim siting rules allowed DOS to permit new intermodal facilities, which receive C & D or putrescible waste in closed leakproof containers for transfer to rail cars or vessels for further transport.
On November 8, 2004, following a public notice period and a public hearing, DOS adopted the final siting rules for solid waste transfer stations (the 2004 siting rules). Under these rules, the siting of nonputrescible and putrescible transfer stations are now treated in the same manner. Community districts are divided into five categories based on a percentage obtained by dividing the number of transfer stations in a given community district by the total number of transfer stations citywide. Each category requires a specific buffer distance, ranging from 400 feet to 700 feet depending on the category, between the transfer facility and a residential district, hospital, public park, school or other transfer station. Unlike previous versions of the rules, no variances from the buffer requirements are permitted for new transfer stations.
In addition, the 2004 siting rules prohibit new transfer stations in zoned Ml districts if the community district in which the facility is proposed already has three or more lawfully operating transfer stations already situated in Ml districts. The new rules also provide that in community districts with 12% or more of the City’s transfer stations, a new transfer station can be permitted only if the facility obtains a corresponding reduction or offset in the daily permitted capacity of an existing transfer station located in the same community district. Based on the restrictions contained in the new rules, the transfer stations sought to be operated by each of the petitioners would be barred.
In this proceeding, petitioners challenge the legality of the 2004 siting rules on the grounds that they exceed the scope of DOS’s regulatory authority under the New York City Administrative Code. It is well settled that an administrative agency cannot create rules that were not contemplated or authorized by the Legislature. (See, e.g., Matter of Tze Chun Liao v New York State Banking Dept., 74 NY2d 505 [1989].) “[T]he jurisdiction of an administrative board or agency consists of the powers granted it by statute, [and thus] a determination is void . . . *282 where it is made either without statutory power or in excess thereof.” (Abiele Contr. v New York City School Constr. Auth., 91 NY2d 1, 10 [1997], quoting Matter of Foy v Schechter, 1 NY2d 604, 612 [1956].)
Petitioners maintain that the Administrative Code does not authorize DOS to adopt rules which would allow it to deny transfer station permits based on the number or capacity of transfer stations already in existence throughout the city. Petitioners contend that since the 2004 siting rules impermissibly provide for such geographic and siting restrictions, DOS unlawfully exceeded its authority in promulgating those rules and thus any decisions made by DOS under those rules must be annulled. Petitioners’ claims are without merit. Section 16-131 (b) (1) of the Administrative Code, added in 1990 by Local Law 40, provides that the Commissioner of DOS shall adopt rules
“establishing . . . requirements appropriate for protection of public health and the environment concerning siting of dumps, non-putrescible solid waste transfer stations, putrescible solid waste transfer stations and/or fill material operations in relation to other such facilities, residential premises and/or other premises for which such requirements may be appropriate.”
Thus, contrary to petitioners’ claims, this section explicitly gives DOS the authority to adopt rules governing the location of transfer stations in relation to other transfer stations, residences and schools.
Nevertheless, petitioners argue that Administrative Code § 16-131.1, which sets forth when DOS may deny a transfer station permit, does not allow DOS to deny a permit based on the number or capacity of transfer stations already in existence. Again, petitioners’ claim is meritless. Section 16-131.1 (b) (4) specifically provides that the Commissioner of DOS may refuse to issue a permit where the applicant has “failed to comply with any of the conditions for issuance of such permits as provided in this chapter or any of the rules promulgated hereunder” (emphasis added). Since DOS lawfully promulgated rules containing geographic and siting restrictions, this section allows DOS to deny a permit for failing to comply with those rules. Thus, petitioners’ claims that DOS unlawfully exceeded its authority in promulgating the 2004 siting rules are without merit and provide no basis for the court to annul the decisions made by DOS under those rules.
*283 Next, petitioners maintain that the 2004 siting rules enacted by DOS are arbitrary and capricious. The applicable standard of review for an administrative determination is whether the challenged agency action has a rational basis. (Matter of Sullivan County Harness Racing Assn. v Glasser, 30 NY2d 269 [1972].) Courts should not overturn administrative determinations unless they are made without sound basis in reason and without regard to the facts. (Matter of County of Monroe v Kaladjian, 83 NY2d 185 [1994].) Where the court finds any reasonable basis in fact for the administrative action, the court’s function is exhausted. (Hughes v Doherty, 5 NY3d 100 [2005].) Petitioners bear the ultimate burden of proving that there is no rational basis for the determination challenged and that the agency action was arbitrary or capricious. (Matter of Mosher v Ward, 218 AD2d 626 [1st Dept 1995].) Moreover, “[a]n administrative agency’s exercise of its rule-making powers is accorded a high degree of judicial deference, especially when the agency acts in the area of its particular expertise.” (Matter of Consolation Nursing Home v Commissioner of N.Y. State Dept. of Health, 85 NY2d 326, 331 [1995].)
Applying these principles, the court concludes that petitioners have failed to meet their burden of establishing that DOS’s promulgation of the 2004 siting rules was arbitrary or capricious. The court’s review of the new siting rules cannot ignore the legislative and judicial backdrop that preceded their enactment. Pursuant to the New York City Administrative Code, DOS is entrusted with the broad authority to oversee and manage the City’s solid waste system. When it enacted Local Law 40, the City Council increased that authority and explicitly mandated that DOS adopt rules establishing requirements for the siting of transfer stations in relation to other transfer stations, residences and other sensitive premises, such as schools, public parks and hospitals. In passing that legislation, the City Council expressly acknowledged that the purpose of the new law was to address “problems associated with transfer stations” such as “the high volume of waste, odors, noise and increased truck traffic and their location near residential communities.” (See Supplemental Rep of the Comm on Governmental Operations, Int. 464-A, June 27, 1990, at 1372.)
Indeed, after Local Law 40 was enacted, a number of courts issued decisions requiring DOS to address the problem of “clustering” of transfer stations in certain neighborhoods. When DOS was first taken to court, the Appellate Division, First *284 Department, concluded that the 1991 and 1994 siting rules did not meet the legislative mandate since they did not address the problem of clustering of transfer stations in particular neighborhoods and their proximity to residences, schools and parks. (Neighbors Against Garbage v Doherty, 245 AD2d at 81.) After DOS enacted more restrictive siting rules in 1998, another court found that those rules were still not restrictive enough because, inter alia, they failed to address the inordinate clustering of transfer stations in areas near residences, schools and parks. (Organization of Waterfront Neighborhoods v Carpinello, Sup Ct, NY County, 1999, Index No. 103661-1999.)
In light of the clear directives from the City Council and the subsequent court decisions finding DOS’s less restrictive siting regulations inadequate, this court concludes that the restrictions and prohibitions contained in the 2004 siting rules constitute a reasonable exercise of DOS’s rule-making authority and are neither arbitrary nor capricious.
“Local governments have long been authorized to enact laws relating to the ‘safety, health and well-being of persons or property’ (NY Const, art IX, § 2 [c] [ii] [10]) and it is well settled that the regulation of solid waste collection and disposal ... is fundamentally related to the public health and welfare.” (Town of Clarkstown v C&A Carbone, 182 AD2d 213, 220-221 [2d Dept 1992], revd on other grounds 511 US 383 [1994].)
“It is beyond question that garbage, with its noxious odors, its decay, and the vermin it attracts, is a ‘deleterious substance’ which is ‘unhealthy’ and an ‘actual or potential nuisance’ with ‘obvious hazards’. Even . . . ‘nonputrescible’ rubbish . . . can be unsightly, toxic, and space consuming. It is a menace to public health, and waste collection and disposal have long been subject to regulation under the police powers.” (New York Coalition of Recycling Enters, v City of New York, 158 Misc 2d 1, 11 [Sup Ct, NY County 1992] [citations omitted].)
Thus, courts have routinely upheld laws and administrative rules regulating waste facilities and their locations. For example, in Town of LaGrange v Giovenetti Enters. (123 AD2d 688 [2d Dept 1986]), the Court upheld a town’s complete prohibition on commercial solid waste transfer stations. The Court found that the defendants had failed to show that the ban was arbitrary and unreasonable or that it had no substantial relation to the *285 public health, safety, morals, or general welfare. The Court held: “To the extent that this ordinance prohibits transfer stations, it is sufficiently related to the town’s concerns with the effect that garbage, rubbish and refuse kept, even temporarily, on private lands within the town would have on the public health, safety and welfare.” (123 AD2d at 689.)
Here, the 2004 siting rules are far less restrictive than the total ban on transfer stations upheld in LaGrange. It is important to emphasize that the new rules do not prohibit new transfer stations. They merely provide strict buffering limits for sensitive land uses, such as schools, public parks and hospitals, and also provide relief to certain neighborhoods that have an inordinate percentage of transfer stations in the city. Furthermore, under the new rules, buffer distances do not apply to facilities that use more environmentally sound methods of transporting waste, such as barge or rail. Finally, even in community districts with high percentages of transfer stations, permits can still be obtained if the applicant obtains offsets in the capacity of an existing transfer station located in the same area. Thus, there is no doubt that the restrictions contained in the 2004 siting rules are far less onerous that the total prohibition upheld in LaGrange. (See Town of Islip v Zalak, 165 AD2d 83, 88 [2d Dept 1991] [in light of court’s holding in LaGrange, it is “beyond any reasonable dispute that the Town of Islip may regulate the ‘transfer station/recycling center’ at issue”]; Matter of Jamaica Recycling v New York State Dept. of Envtl. Conservation, 308 AD2d 538 [2d Dept 2003] [where administrative agency has been granted broad power to regulate in the public interest, courts do not hesitate to uphold reasonable acts on its part designed to further the regulatory scheme].)
Petitioners’ contention that solid waste transfer stations do not cause adverse impacts to residential communities, schools, public parks and hospitals is neither persuasive nor established as a matter of law by petitioners’ submissions. There can be no doubt that transfer stations can create odors, dust and noise and thus are a potential nuisance to neighboring communities. As noted in DOS’s response, putrescible stations, if not operated properly, can attract vermin and be a source of odors in a community. Furthermore, if the waste piles at nonputrescible transfer stations are not properly treated with dust suppression measures, under windy conditions they can blow dust onto neighboring properties creating adverse air quality impacts and a potential public health hazard. In addition, DOS’s affidavits *286 in opposition state that the location of petitioners’ proposed facilities can only be reached by vehicular traffic which creates additional concerns associated with the air pollution, noise and traffic created by the diesel trucks servicing these facilities. Moreover, there is no dispute that certain communities in the city are already burdened with a disproportionate percentage of transfer facilities. Indeed, more than half of the city’s 56 transfer stations are located in three community districts. In light of these factors, it cannot be said that the 2004 siting rules are not rationally based.
This court’s conclusion is consistent with a long line of cases which hold that, in the exercise of their police powers, municipalities may regulate the disposal of solid waste. (See, e.g., Matter of Amstel Recycling & Concrete Corp. v City of New York, 287 AD2d 385, 386 [1st Dept 2001] [recognizing New York City’s interest in “heavily regulat[ing]” waste transfer stations because of their impact on local communities]; Monroe-Livingston Sanitary Landfill v Town of Caledonia, 51 NY2d 679 [1980] [upholding law limiting acceptance of refuse generated outside of the town]; Wiggins v Town of Somers, 4 NY2d 215 [1958] [upholding complete prohibition on dumping of garbage which originated outside municipality’s borders]; Moran v Village of Philmont, 147 AD2d 230, 234 [3d Dept 1989] [prohibition of private landfills within town’s borders was a valid exercise of town’s police power in light of “obvious” potential hazards of disposal of solid waste near residential communities]; Town of Plattekill v Dutchess Sanitation, 56 AD2d 150, 151 [3d Dept 1977] [“garbage dumps, no matter how carefully controlled, present some hazard to a community”].)
Likewise, courts have repeatedly upheld the use of buffer zones based on the geographic location of a proposed land use to protect other neighboring uses. (See, e.g., Stringfellow’s of N.Y. v City of New York, 91 NY2d 382 [1998] [upholding 500-foot buffer between “adult establishments” and schools, daycare centers and houses of worship]; Matter of Big Apple Food Vendors’ Assn. v Street Vendor Review Panel, 90 NY2d 402 [1997] [upholding rule restricting vending on 26 new streets not previously regulated]; Matter of Laidlaw Waste Sys. v Planning Bd. of Town of Islip, 305 AD2d 413 [2d Dept 2003] [upholding denial of transfer station permit under statute requiring that such facility be located a distance of at least 200 feet from property zoned for residential use].)
There is no merit to petitioners’ contention that the 2004 siting rules should be struck down because they are contrary to *287 the findings contained in the 2004 Commercial Waste Management Study (CWMS). Although petitioners place much emphasis on this study, the court concludes that it does not establish that the new siting rules are arbitrary or capricious. The 2004 siting rules challenged here involve DOS’s criteria for issuing new transfer station permits. However, the CWMS emphasizes, over and over again, that it only studied the cumulative impacts of existing transfer stations in certain neighborhoods. At the outset, the CWMS states that its purpose is “[t]o assess the effectiveness of the existing framework of rules and regulations . . . governing operation of Transfer Stations .” (CWMS Executive Summary § 1.0, at 2.) In the section on the transfer station study, the CWMS states that it studied the combined environmental effects of the existing stations, “but did not consider new siting actions.” (CWMS Executive Summary § 3.1.1.2, at 12.) Indeed, the study expressly acknowledges “the potential for adverse impacts from a future siting action.” (CWMS Executive Summary § 3.1.1.2, at 12.) Although the study speculated that the then-existing rules would “tend to mitigate” the potential for such adverse effects, it by no means concluded that the existing regulations would be adequate to deal with additional transfer stations in a given area (id.).
In sum, the court concludes that the 2004 siting rules enacted by DOS are rationally based and are neither arbitrary nor capricious. DOS has properly exercised its discretion and has fulfilled its statutory and court-ordered obligations to promulgate rules to protect residential neighborhoods, parks and schools throughout the city. Likewise, DOS has met its statutory mandate to ensure that additional transfer stations are not clustered in communities already burdened with a high percentage of these facilities. The 2004 siting rules should therefore be upheld and petitioners’ article 78 claims to the contrary should be denied.[2]
Next, petitioners maintain that, regardless of the validity of the 2004 siting rules, they are entitled to permits for their *288 transfer stations under the “special facts” exception. Before discussing the applicability of the special facts exception, it is necessary to provide some background on the permitting process. In order to operate a solid waste transfer station, an applicant must first obtain a permit from both DOS and the New York State Department of Environmental Conservation (DEC). The two agencies together conduct an environmental review of each permit application under the State Environmental Quality Review Act (SEQRA) and the City Environmental Quality Review (CEQR) laws.[3] Although DEC plays an important role in this process, DOS is primarily responsible for conducting the review.
In order to commence the review process, the applicant is required to submit an environmental assessment statement (EAS) which serves as the means by which the agencies evaluate the potential impact the transfer station would have on the environment. Potential impacts considered include traffic and transportation, waterfront issues, air quality, noise, hazardous materials, land use, zoning, public health, solid waste, and neighborhood character. Upon receipt of the EAS, DOS forwards the document to DEC and other involved city agencies so that each agency can assess the potential impacts that fall within that agency’s expertise. Based on its review, each agency can either “sign off” on the EAS or request additional information from the applicant.
At the completion of the review, DEC and DOS jointly determine, based on a full analysis of the potential impacts, whether the proposed facility would have a significant adverse impact on the environment. If the agencies conclude that there are no significant adverse impacts, a negative declaration is issued and the review process ends. If, on the other hand, the agencies determine that the proposed facility may have a significant averse impact, a more detailed environmental review will be required. In either case, a completed environmental review is a prerequisite to the issuance of any permit.
It is well settled that
“when a zoning law has been amended after the submission of an application seeking [a project’s] approval, but before a decision is rendered thereon by the reviewing agency, the courts are bound to ap *289 ply the law as amended unless ‘special facts’ indicate that the [agency] ‘acted in bad faith and unduly delayed acting upon [the] application while the zoning law was changed’.” (Matter of Cleary v Bibbo, 241 AD2d 887, 888 [3d Dept 1997], quoting Matter of Bibeau v Village Clerk of Vil. of Tuxedo Park, 145 AD2d 478, 479 [2d Dept 1988].)
The special facts exception is not applicable unless the petitioner demonstrates that it was “entitled to the permit as a matter of right by full compliance with the requirements at the time of the application.” (Matter of Pokoik v Silsdorf, 40 NY2d 769, 773 [1976].) Thus, a party seeking to rely on this exception must show that the permit sought “would have been granted under the law as it existed at the time the application for the [permit] should have been passed upon.” (Matter of Our Lady of Good Counsel R.C. Church & School v Ball, 45 AD2d 66, 72 [2d Dept 1974].)
Applying these principles, the court concludes that petitioners’ permit applications do not fall within the special facts exception. To begin, none of the petitioners has established that it was entitled to a permit prior to the promulgation of the new siting rules because none had completed the joint DOS-DEC environmental review process. At the time DOS instituted its 2002 moratorium and stopped processing the permit applications, the DOS SEQRA/CEQR process was still ongoing for Jamaica, Fontana and USA Recycling. Although East Bay had received a negative declaration from DOS, it had yet to receive approval from DEC. Allocco had not even filed an application for the new permit to which it now claims to be entitled. Furthermore, petitioners have failed to show that their proposed facilities would have no significant adverse environmental impacts and that DOS would have issued a negative declaration and approved the permits. Thus, since none of the petitioners was entitled as of right to the permits sought, the special facts exception is inapplicable. (See, e.g., Matter of Anstu Farm v Town Bd. of Town of Wash., 285 AD2d 503 [2d Dept 2001] [case not within special facts exception since the petitioner was not entitled to a permit for a private heliport as a matter of right prior to the enactment of the new ordinance]; Morgan v Town of W. Bloomfield, 295 AD2d 902 [4th Dept 2002] [special facts doctrine not applicable because entitlement to special use permit was not a matter of right].)
Nevertheless, Jamaica argues that it was entitled to a permit since it had received all of the necessary approvals by the time *290 DOS instituted the 2002 moratorium. In particular, Jamaica states that by November 2002, it had obtained 24 written environmental approvals from various agencies and a verbal approval from the New York City Department of Environmental Protection (DEP). However, Jamaica does not submit an affidavit from anyone with personal knowledge providing any details of this alleged verbal sign off. In any event, there is no dispute that no written approval had been obtained from DEP and that DOS never issued a negative declaration under SEQRA/CEQR. Thus, Jamaica’s arguments are without merit.
In addition to failing to establish as of right entitlement to the permits at issue, petitioners have neglected to show that DOS engaged in bad faith dilatory conduct or that DOS willfully or unreasonably delayed the permitting process. Where the delay in processing an application is “attributable to legitimate circumstances, rather than due to ‘malice, oppression, manipulation or corruption,’ ” the special facts exception does not apply. (Matter of Home Depot U.S.A. v Village of Rockville Ctr., 295 AD2d 426, 429 [2d Dept 2002].) Most of the delay alleged by Jamaica, Fontana and USA Recycling focuses on the environmental review of their applications prior to the 2002 moratorium.[4] However, the environmental review contemplated by SE-QRA and CEQR is labor-intensive and time-consuming. As noted above, the review encompasses a broad range of areas, including traffic and transportation, waterfront issues, air quality, noise, hazardous materials, land use, zoning, public health, solid waste, and neighborhood character. In addition, dozens of city agencies, as well as DEC, are involved in the process.
Furthermore, during the time the review process was taking place, DOS was in the process of complying with two court orders directing DOS to enact new siting regulations. (See Matter of John v Division of Hous. & Community Renewal of Off. of Rent Admin, of State of N.Y., 140 AD2d 193 [1st Dept 1988] [refusing to apply special facts exception where delay due in part to fact that agency was undertaking new responsibilities and had an unusually heavy caseload].) In light of the complexity of the review process, the fact that DOS was busy drafting new *291 siting rules, and in the absence of any specific allegation of bad faith, the court concludes that petitioners have failed to show that any delay in processing the applications was willful. Accordingly, the special facts exception does not apply.[5]
The fact that DOS’s 2002 moratorium was subsequently declared improper does not establish that DOS acted in bad faith. To begin, DOS continues to maintain in this proceeding that the moratorium was in all respects proper and no appellate court has ruled on the issue. Furthermore, before reversing herself, Justice Heitler had rejected Jamaica’s arguments on the unlawfulness of the moratorium and had dismissed Jamaica’s article 78 petition. Thus, for a period of time following the moratorium, DOS had two contrary opinions on the legality of its actions from courts of concurrent jurisdiction. Furthermore, during the time the moratorium was in effect, Justice Heitler’s initial decision was the subject of both a reargument motion and an appeal. In light of these factors, the court cannot conclude that any delay in processing the permit applications following the moratorium was in bad faith. Finally, petitioners’ unsupported claim that DOS knowingly enacted an illegal moratorium in an intentional effort to delay processing the permit applications is entirely speculative and provides no basis for the court to find bad faith. (See Matter of Ronsvalle v Totman, 303 AD2d 897 [3d Dept 2003] [refusing to apply special facts exception since imposition of moratorium, even if unlawful, was not shown to be motivated by malice, corruption or bad faith].)
There is no merit to petitioners’ argument that the special facts exception should apply because DOS intentionally disobeyed prior court orders. Petitioners are correct that, in August 2003, Justice Lebedeff directed DOS to complete an environmental review of Fontana’s proposed transfer station within 90 days. However, in March 2004, after further motion practice, Justice Lebedeff revisited the issue and granted DOS an additional 60 days from that date to complete the review. Petitioners have failed to show that DOS’s failure to complete *292 the review within that time period was willful. It was not until June 2004 that Fontana submitted a revised EAS for the facility. Upon review of the EAS, DOS identified numerous deficiencies and requested additional information from Fontana. Indeed, DOS maintains that Fontana’s EAS is still incomplete to this day. Thus, it cannot be said that DOS intentionally disobeyed Justice Lebedeff s orders.
Nor did DOS fail to abide by Justice Heitler’s order in Jamaica’s earlier article 78 petition. On November 23, 2004, Justice Heitler directed DOS to continue to review Jamaica’s permit application under CEQR and New York City Administrative Code § 16-131.1. However, by the time that order was issued, the 2004 siting rules had already been enacted. Thus, applying those new rules, DOS complied with Justice Heitler’s order and denied Jamaica’s permit application. Contrary to Jamaica’s contention, Justice Heitler did not explicitly order that the review be conducted pursuant to the old siting rules. Notably, neither Justice Heitler nor Justice Lebedeff ever held that DOS was proceeding in bad faith. Nor did they find DOS in contempt or issue any other sanction. Thus, the prior court orders provide no basis for this court to find that DOS acted in bad faith or that the special facts exception should be applied.
Next, petitioners claim that the vested rights doctrine requires DOS to process the permit applications under the old siting rules. Under that doctrine, “where a more restrictive zoning ordinance is enacted, an owner will be permitted to complete a structure or a development which an amendment has rendered nonconforming only where the owner has undertaken substantial construction and made substantial expenditures prior to the effective date of the amendment.” (Matter of Ellington Constr. Corp. v Zoning Bd. of Appeals of Inc. Vil. of New Hempstead, 77 NY2d 114, 122 [1990].) At the outset, it is by no means clear that the vested rights doctrine, which typically involves building permits under the zoning laws, is even applicable to the transfer station permits at issue here. Notably, petitioners are not entitled as of right to operate transfer stations; rather, such permits are temporary in nature and granted on an annual basis. (See, e.g., Matter of Allied Grocers Coop, v Tax Appeals Trib., 162 AD2d 791, 792 [3d Dept 1990] [“(petitioner’s license to act as a wholesaler and stamping agent created no vested right, but is merely a privilege extended by the State subject to alteration by the imposition of reasonable restrictions”]; Matter of Lap v Axelrod, 95 AD2d 457 [3d Dept *293 1983] [a right to hold a license is not a vested right since the State may change such right or the conditions under which the license may be held].)
Even if the vested rights doctrine is applicable to the transfer station permits at issue, petitioners have failed to show that the doctrine applies. It is well settled that a right vests only where a property owner has a legally issued permit and has “demonstrate [d] a commitment to the purpose for which the permit was granted by effecting substantial changes and incurring substantial expenses to further the development.” (Town of Orangetown v Magee, 88 NY2d 41, 47 [1996]; see also Matter of Lombardi v Habicht, 293 AD2d 474 [2d Dept 2002] [vested rights acquired where petitioners made substantial expenditures and completed 80% of construction of home pursuant to validly issued permit].)
Here, as noted above, none of the petitioners had been issued a permit to operate their proposed transfer stations at the time the new siting rules went into effect. Likewise, none of the petitioners has established by competent proof that they have made substantial expenditures. Indeed, petitioners USA Recycling, East Bay and Allocco seek permits for completely new facilities that have never operated before. Although Jamaica and Fontana had previously operated transfer stations at the proposed sites, neither facility was in operation under a lawful permit at the time they applied for the permits at issue. Finally, the fact that petitioners may have spent money on the permit application process in anticipation that the permits would issue does not create vested rights. (See Matter of Rudolf Steiner Fellowship Found, v De Luccia, 90 NY2d 453 [1997] [expenditures made in applying for use variance were not made in reliance upon a validly issued permit and thus did not create vested rights].)
Petitioners also argue that DOS should be equitably estopped from applying the 2004 siting rules to the permit applications. However, equitable estoppel generally “may not be invoked against a governmental agency to prevent it from discharging its statutory duties.” (Matter of E.F.S. Ventures Corp. v Foster, 71 NY2d 359, 369 [1988]; see also LoCiciro v Metropolitan Transp. Auth., 288 AD2d 353, 355 [2d Dept 2001] [estoppel is to be invoked against government agencies “sparingly” and only in “exceptional circumstances”].) Furthermore, to establish equitable estoppel, petitioners must show “fraud, misrepresentation, deception or similar affirmative misconduct.” (Matter of *294 Concerned Port Residents Comm. v Incorporated Vil. of Sands Point, 291 AD2d 494, 495 [2d Dept 2002].) As discussed above, petitioners have failed to show that DOS engaged in any affirmative fraud or misrepresentation, or any other bad faith activity. Thus, there is no basis for this court to invoke equitable estoppel.
Finally, there is no merit to petitioners’ claim that DOS’s application of the 2004 siting rules to the proposed transfer stations constitutes an unlawful regulatory taking. A statute regulating the use of property effects a taking only if it does not substantially advance legitimate state interests or denies an owner the economically viable use of his land. (Seawall Assoc. v City of New York, 74 NY2d 92 [1989].) A property owner asserting a takings claim bears the “heavy burden of overcoming the presumption of constitutionality that attaches to the regulation and of proving every element of his claim beyond a reasonable doubt.” (de St. Aubin v Flacke, 68 NY2d 66, 76 [1986].) As discussed above, the regulation of transfer stations in city neighborhoods substantially advances legitimate governmental interests. (See New York Coalition of Recycling Enters, v City of New York, 158 Misc 2d at 1 [finding that Local Law 40, which directed DOS to adopt rules establishing requirements for the siting of transfer stations, is rationally related to a legitimate governmental purpose].)
Furthermore, petitioners provide no proof, other than conclusory assertions, that there is no other economically viable use for their land. (See Briarcliff Assoc. v Town of Cortlandt, 272 AD2d 488 [2d Dept 2000] [a plaintiff asserting a takings claim must come forward with “ ‘ “dollars and cents evidence” . . . that under no permissible use would the parcel as a whole be capable of producing a reasonable return’ ”].) Simply put, “petitioners do not have immunity against the exercise of the [City’s] police power [merely] because their businesses were originally established in full compliance with then existing laws.” (New York Coalition of Recycling Enters, v City of New York, 158 Misc 2d at 13.) Thus, the court rejects petitioners’ claim that DOS’s actions constitute an unlawful regulatory taking.
Accordingly, it is ordered and adjudged that petitioners’ article 78 petitions are denied and this consolidated proceeding is dismissed in its entirety.

. Petitioners Jamaica Recycling Corp., Allocco Recycling, Ltd., East Bay Recycling, Inc., Fontana Transfer Station, Inc. and Fontana Waste Transfer, Inc. (collectively Fontana), and USA Recycling, Inc. each brought separate article 78 petitions. By order dated May 16, 2005, this court granted respondents’ motion to consolidate the five petitions into one proceeding.

. USA Recycling also challenges DOS’s denial of its permit application on the grounds that there are no actual residences in the residential district located within 400 feet of its transfer station. USA Recycling also contends that such mandatory buffer distances are arbitrary and capricious because residential districts do not always contain residences. The court, however, finds this buffer requirement to be entirely rational because residential districts permit residences and thus have the potential to contain residences. Since it is undisputed that USA Recycling’s facility is within 400 feet of a residential district, DOS’s denial of a permit was proper.

. This joint review procedure, in which both DOS and DEC are designated as co-lead agencies, came about as a result of a March 1993 so-ordered stipulation in another case.

. East Bay does not contend that DOS improperly delayed consideration of its application. Rather, East Bay maintains that after DOS issued a negative declaration, DEC failed to issue its own negative declaration as part of the joint SEQRA/CEQR review. However, since the decision by DEC is not within the control of DOS, any delay by DEC cannot be attributable to DOS. Allocco does not contend that DOS engaged in improper delay because Allocco never submitted a permit application.

. Moreover, the special facts doctrine is not implicated where the applicant’s own actions, such as neglect of the application or its decision to change the type of project involved during the review period caused the delay. (Matter of Nichol v Planning Bd. of Vil. of Manlius, 28 AD2d 1077 [4th Dept 1967]; Matter of Gramatan Hills Manor v Manganiello, 30 Misc 2d 117 [Sup Ct, Westchester County 1961].) DOS has submitted convincing evidence showing that Jamaica, USA Recycling and Fontana each contributed substantially to the length of the environmental review process.